## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | |
|---|---|
| PRIORITIES USA,<br><br>               Plaintiff,<br><br>   v.<br><br>JOCELYN BENSON, in her official<br>capacity as the Michigan Secretary of State,<br><br>               Defendant. | Civil Action No. |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Priorities USA files this Complaint for Declaratory and Injunctive Relief against Defendant JOCELYN BENSON, in her official capacity as the Michigan Secretary of State, and alleges as follows:

### NATURE OF THE CASE

1.     The right to vote is "of the essence of a democratic society," and restrictions on the franchise "strike at the heart of representative government." *Reynolds v. Simms*, 377 U.S. 533, 555 (1964). But, for absentee voters in Michigan, this fundamental right is contingent on the State's arbitrary and standardless signature matching laws, which have disenfranchised hundreds of voters in recent elections for no other reason than an election official's subjective and arbitrary determination that a voter's signature on an absentee ballot (or ballot

1

application) did not match a prior signature that the voter provided to election officials.

2.     These error-prone signature comparisons (collectively, the "Signature Matching Regime") are mandated by outdated Michigan election laws that apply to multiple phases of the absentee voting process. In the first phase, the city or township clerk[1] must compare a voter's signature on an absentee ballot application with her previously digitized signature set forth in the Qualified Voter File, or the State's voter database, or, if not available, her "master" card signature[2] on file (collectively, the "reference signature"), and reject all applications for which the clerk determines that the voter's signatures do not match. MICH. COMP. LAWS § 168.761(1)-(2).

3.     If a voter's absentee ballot application survives the first round of signature matching, and the voter receives and submits her absentee ballot, a city or township clerk must conduct the signature-matching review again, this time comparing the voter's signature on the absentee ballot envelope with the voter's

---

[1] In Michigan, city and township clerks "maintain the registration records for their respective jurisdictions and are responsible for administering all federal, state, county and local elections." *Michigan's Elections Systems Structure Overview*, MICH. SEC'Y OF STATE, https://www.michigan.gov/sos/0,4670,7-127-1633_8716-27476--,00.html.

[2] "Master card" signatures are generated from voter registration applications. *Election Officials' Manual*, MICH. BUREAU OF ELECTIONS at 10 (February 2019), https://www.michigan.gov/documents/sos/II_Voter_Registration_265983_7.pdf.

reference signature, and reject the ballot if the clerk concludes that the signatures do not match. *See* MICH. COMP. LAWS ANN. § 168.765a(6).

4.     Finally, the clerk must send the absentee ballots that survive the initial signature reviews to the board of election inspectors,[3] which once again compares the voter's signature on the absentee ballot envelope with the reference signature and rejects the ballot outright if it concludes that the signatures do not match. *See* MICH. COMP. LAWS § 168.766(1)(a), (2).

5.     Thus, under this Signature Matching Regime, Michiganders who attempt to vote absentee can be denied the franchise outright based solely on an election official's determination, during any one of the several stages of signature review, that a voter's signature on the ballot envelope does not sufficiently resemble a signature that she provided to election officials at some point in the past.

6.     The problem with this scheme is that individuals often vary how they sign their name for many well-documented reasons, including, for example, age, illness, injury, medication, eyesight, pen type, ink, writing surface or position, paper quality, or psychological factors, and State law does not require election

---

[3] In Michigan, a board of election inspectors, which consists of appointed and trained qualified electors, is charged with counting absentee ballots, among other duties.

officials—neither clerks nor the board of election inspectors—to undergo any training whatsoever in signature or handwriting analysis that would allow them to distinguish accurately between normal variations in authentic signatures and forgeries. In fact, no one really knows how Michigan election officials decide whether a signature on an absentee ballot or ballot application is sufficiently similar to the previously designated signature to withstand scrutiny. Here, election officials have unfettered discretion, and the fate of an absentee ballot or ballot application depends on whichever arbitrary standard is employed by the particular city or township in which the voter resides, as well as the election officials charged with reviewing the signatures.

7.     As numerous studies have shown, signature matching conducted by laypersons results in a high rate of error that not only skews toward the over-rejection of legitimate signatures, but also disproportionately impacts the votes of racial and ethnic minorities, young first-time voters, individuals with disabilities, and senior-citizens.

8.     And yet, notwithstanding the high rate of error inherent in signature matching, State law provides no mechanism by which voters whose ballots are wrongfully discarded for alleged signature mismatches may challenge that determination or cure their rejected ballots or absentee ballot applications.

9.      Michigan law does not even require election officials to notify voters that their ballots or absentee ballot applications have been rejected for an alleged signature mismatch, meaning that voters may be unaware that they must take action to ensure that their vote is counted, if there is time to do so, before 8 p.m. on Election Day. Recognizing the significant threat of disenfranchisement that this lack of notification poses, even the Defendant Secretary of State Benson has endorsed revisions to Michigan law to require "clerks to try to notify voters who send in ballot envelopes with . . . mismatched signatures." AP, *Michigan Secretary of State Proposes Having Absentee Ballots Counted Before Election Day* (Mar. 11, 2019), https://www.wxyz.com/news/michigan-secretary-of-state-proposes-having-absentee-ballots-counted-before-election-day. Under the current statutory framework, however, the penalty for a perceived but wrongful determination of a signature mismatch is often disenfranchisement.

10.     The burden that these laws impose on the right to vote is undeniable and unjustified. Any potential concerns about voter fraud in the absentee voting process are already effectively addressed by other Michigan laws, including statutes criminalizing behavior that the Signature Matching Regime purportedly prevents. *See, e.g.*, MICH. COMP. LAWS § 168.759(5), (8) (criminalizing falsifying or forging signatures on absentee applications); MICH. COMP. LAWS § 168.761(4) (criminalizing falsifying absentee ballots). And, as the former Michigan Director

5

of Elections acknowledged, "Michigan does not have a culture of fraudulent elections."

11.   A growing number of courts across the country have recognized that such arbitrary rejection of absentee ballots and ballot applications—based on subjective signature comparisons by untrained individuals, and without notification, much less an opportunity to contest or cure such a determination—imposes an undue burden on the right to vote, subjects similarly-situated voters to diverging standards, and erroneously deprives voters of their due process rights, in violation of the First and Fourteenth Amendments to the United States Constitution. *See, e.g.*, *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1319-1320 (11th Cir. 2019) (holding Florida's failure to "enact[] uniform standards for matching signatures" and the lack of "qualifications or training for those who engage in the job" of signature matching seriously burdened the right to vote); *Saucedo v. Gardner* 335 F. Supp. 3d 202, 222 (D.N.H. 2018) (holding New Hampshire's signature matching law, which resulted in the rejection of hundreds of absentee ballots, violated the Due Process Clause because it "vest[ed] moderators with sole, unreviewable discretion to reject ballots due to signature mismatch," did not impose "training and functional standards on handwriting analysis," and did not provide an opportunity to cure); *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1339-40 (N.D. Ga. 2018) (holding Georgia's signature matching law, which gave an

untrained election official "unchecked discretion" to determine if two signatures match and imposed an illusory cure process, violated the Due Process Clause); *Fla. Democratic Party v. Detzner*, No. 4:16-cv-607, 2016 WL 6090943, at *8 (N.D. Fla. Oct. 16, 2016) (holding Florida signature matching law that provided no opportunity to cure signature mismatch determinations imposed "an unconstitutional obstacle to the right to vote"); *LULAC v. Pate*, Case No. CVCV056403 (Iowa Dist. Ct Sept. 30, 2019) (holding Iowa's signature matching law for absentee ballots, which required untrained officials to compare signatures without adequate standards, violated the Iowa Constitution).

12.　Absent relief from this Court, Michigan's Signature Matching Regime will disenfranchise many more voters in upcoming elections, particularly in light of the State's recently-enacted constitutional amendment adopting no-reason absentee voting. In other words, the Signature Matching Regime will not only deny Michiganders the right to vote, but it will also undermine the election reforms approved by voters specifically to expand access to the franchise. Plaintiff therefore brings this lawsuit to enforce the fundamental right to vote protected by the United States Constitution.

## JURISDICTION AND VENUE

13.     Plaintiff brings this action under 42 U.S.C. §§ 1983 and 1988 to redress the deprivation under color of state law of rights secured by the United States Constitution.

14.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343, because the matters in controversy arise under the Constitution and laws of the United States.

15.     This Court has personal jurisdiction over the Defendant, the Secretary of State, who is sued in her official capacity only.

16.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2) because, *inter alia*, a substantial part of the events that gave rise to Plaintiff's claim occurred in this judicial district.

17.     This Court has the authority to enter a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202.

18.     All conditions precedent to the maintenance of this case and Plaintiff's claims have occurred, been performed, or otherwise been waived.

## PARTIES

19.      Plaintiff Priorities USA ("Priorities") is a 501(c)(4) nonprofit, voter-centric progressive advocacy and service organization. Priorities' mission is to build a permanent infrastructure to engage Americans in the progressive movement

by running a permanent digital campaign to persuade and mobilize citizens around issues and elections that affect their lives. In furtherance of this purpose, Priorities works to help educate, mobilize, and turn out voters across the country, including in Michigan. Priorities expects to make contributions and expenditures in the millions of dollars to educate, mobilize and turn out voters in the upcoming elections around the country, including in Michigan state and federal elections. Michigan's Signature Matching Regime directly harms Priorities by frustrating its mission of, and efforts in, educating, mobilizing and turning out voters in the State by disenfranchising voters due to perceived signature mismatches. Priorities is aware of the Signature Matching Regime and will have to expend and divert additional funds and resources in GOTV, voter education efforts, mobilization, and turn out activities in Michigan, at the expense of its efforts in other states and its other efforts in Michigan, in order to combat the effects of the Signature Matching Regime on individuals who attempt to vote by absentee ballot only to have their ballots erroneously rejected.

20.     Defendant, JOCELYN BENSON, is the Secretary of State of Michigan and is sued in her official capacity. She is Michigan's chief elections officer and, as such, has "supervisory control over local election officials in the performance of their duties." MICH. COMP. LAWS § 168.21. She is specifically responsible for "[a]dvis[ing] and direct[ing] local election officials as to the proper

methods of conducting elections." MICH. COMP. LAWS § 168.31(1)(b). Secretary Benson is also responsible for "[e]stablish[ing] a curriculum for comprehensive training and accreditation of all county, city, township, and village officials who are responsible for conducting elections." *Id.* at (1)(j). The Secretary of State, personally and through the conduct of her employees, officers, agents, and servants, acted under color of State law at all times relevant to this action.

## STATEMENT OF FACTS AND LAW

### A. Michigan Law Imposes a Signature Matching Requirement on Absentee Ballot Applications.

21.    The Michigan Constitution gives voters the right to cast absentee ballots, *see* MICH. CONST., art. II, § 4(1)(g), and the practice is very popular in the State. In the 2016 presidential and the 2018 midterm elections, for example, over a million Michiganders—or around a quarter of the electorate—voted absentee.

22.    Before casting an absentee ballot, voters in Michigan must submit an application, which can be done in-person or by mail. An application submitted by mail must be received by the clerk by 5 p.m. on the Friday before Election Day, *see* MICH. COMP. LAWS § 168.759(1), though an individual applying in-person for an absentee ballot can do so until 4 p.m. on the day before Election Day. MICH. COMP. LAWS § 168.761(3). A voter who registers to vote in-person on Election Day, however, can apply for and obtain an absentee ballot until 8 p.m. that day. *See* MICH. COMP. LAWS § 168.759(2).

23.    Once a voter's application for an absentee ballot is submitted, Michigan law requires the receiving township or city clerk to compare the signature on the absentee ballot application to the corresponding voter's digitized signature in the Qualified Voter File or, if that signature is not available, to the voter's registration or "master" card signature. MICH. COMP. LAWS § 168.761(2).

24.    If the clerk determines that the signature on the application matches the designated signature of the voter, the clerk will then forward by mail, or provide in-person, an absentee ballot and a return envelope to the voter to allow him to vote absentee. *See id.* at (1). But if the clerk determines that the signature on the absentee ballot application and the voter's corresponding reference signature do not match, the clerk must reject the application. *See id.*

25.    To be sure, the clerks' signature matching determinations are not driven by any uniform, statewide standard. Michigan law gives no guidance on the questions that inevitably arise in conducting signature matching, including, for example, what stylistic differences suggest that two signatures were made by different individuals, as opposed to one individual whose signatures merely show natural variations for reasons unrelated to their authenticity.

26.    Nor are the clerks or members of the board who conduct this signature matching exercise required to undergo any type of handwriting analysis or

signature matching training before comparing signatures and determining whether to reject absentee ballot applications due to perceived mismatches.

27.     Furthermore, Michigan law does not require a clerk to inform a voter of a rejected absentee ballot application. And voters in Michigan have no means under State law by which they can contest a wrongful determination, much less cure an alleged signature mismatch.

### B. Michigan Law Imposes a Signature Matching Requirement on Absentee Ballots.

28.     To vote an absentee ballot—which requires that the voter's absentee ballot application survive the first signature review—voters must place the ballot in a specially designated, sealed secrecy envelope and sign the outside of the envelope before submitting it to the clerk. MICH. COMP. LAWS § 168.764a.

29.     A voter can either submit her ballot by mail, in-person, or by making special arrangements for a clerk's representative to pick up the ballot. *Id.* at (a)-(b), (d). Alternatively, a member of the voter's "immediate family," which is defined narrowly, "may mail or deliver [the] ballot to the clerk for the voter." *Id.* at (c).

30.     For an absentee ballot to be counted, it must reach the clerk or an authorized assistant before the polls close at 8 p.m. on Election Day, *id.* at (d), and it must pass yet another signature-match examination.

31.     Similar to restrictions on absentee ballot applications, Michigan law mandates that an absentee ballot be rejected if the signature on the ballot envelope

does not match the voter's reference signature. *See* MICH. COMP. LAWS ANN. §
168.767. Specifically, Michigan Compiled Laws Section 168.767 states:

> If . . . it is determined that the signature on the envelope does not
> agree sufficiently with the signature on the registration card or the
> digitized signature contained in the qualified voter file as provided
> under section 766. . . , then such vote shall be rejected.[4]

32.     Michigan law requires the township or city clerk to conduct this
signature matching analysis in the first instance and send to the board of election
inspectors only the absentee ballots that pass the clerk's initial signature matching
review. *See* MICH. COMP. LAWS § 168.765a(6).

33.     The board of election inspectors then conducts yet another round of
signature matching. *See* MICH. COMP. LAWS § 168.766(1)(a). In particular, the
statute provides:

> Upon receipt from the city or township clerk of any envelope
> containing the marked ballot or ballots of an absent voter, the board of
> inspectors of election shall verify the legality of the vote by. . .
> [e]xamining the digitized signature for the absent voter included in the
> qualified voter file under section 509q or the registration record as

---

[4] The most recent version of the Election Officials' Manual also requires that "the
signature appearing on the [absentee voter] certificate must be checked against the
signature on the applicant's [absentee ballot] application which was previously
checked against the applicant's voter registration record to verify the applicant's
identity." *Election Officials' Manual*, MICH. BUREAU OF ELECTIONS at 6 (February
2019),
https://www.michigan.gov/documents/sos/VI_Michigans_Absentee_Voting_Proce
ss_265992_7.pdf.

provided in subsection (2) to see. . . that the signature on the statement
agrees with the signature on the registration record.

*Id.*

34.    Like the review of ballot applications, election officials engaged in
signature matching for absentee ballots are not guided by any statewide uniform
standard, nor do they receive any training in signature analysis or any other
guidance from the State on what constitutes a valid signature.

35.    Furthermore, when an absentee ballot is rejected due to a signature
mismatch determination, Michigan law does not require election officials to inform
the voter of this decision. Thus, voters may not be aware that they must take
further action to ensure that their vote is counted before the 8 p.m. Election Day
deadline, and Michigan law does not provide voters an opportunity to contest,
much less cure, a signature mismatch determination.[5]

### C. Michigan's Signature Matching Regime is Highly Error-Prone.

36.    Because Michigan's Signature Matching Regime involves untrained
human reviewers, it is highly error-prone. Studies conducted by experts in the field
of handwriting analysis have repeatedly found that signature verification by

---

[5] Though, Michigan law allows voters to "cure" provisional ballots within 6 days
after Election Day to ensure that they are counted. *See* MICH. COMP. LAWS §
168.813.

laypersons is inherently unreliable, and non-experts are significantly more likely to misidentify authentic signatures as forgeries.

37.    In one study, for instance, laypersons falsely declared authentic signatures to be inauthentic at least 26 percent of the time, despite having access to six authentic reference signatures for comparison. K. Gummadidala, *Signature authentication by forensic document examiners*, J. FORENSIC SCI., 46(4) 884-88 (2001).

38.    This high rate of error is due in part to the fact that handwriting can change quickly for a variety of reasons, including physical factors, such as age, illness, injury, medication, eyesight, alcohol, and drugs; mechanical factors, such as pen type, ink, writing surface and position, and paper quality; and psychological state of mind.[6] *See*, *e.g.*, Tomislav Fotak, et al., *Handwritten signature identification using basic concepts of graph theory*, 7 WSEAS Transactions on Signal Processing 145 (2011).

39.    It is, therefore, inevitable that election officials will erroneously reject legitimate ballots due to misperceived signature mismatches, resulting in the disenfranchisement of eligible voters.

---

[6] Signatures also can vary significantly over time. *See* Michael P. Caligiuri, et al., *Kinematics of Signature Writing in Healthy Aging*, 59 J. OF FORENSIC SCI. 1020 (2014), *available at* https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4077921/.

40.     Signature matching laws are particularly problematic for racial and ethnic minority voters; young, first-time voters; voters with disabilities; and senior citizen voters, all of whom are more likely to have variations in their signatures, or voters who may require assistance from others to enter a signature. *See* Caligiuri, *supra* (concluding that the "advanced age of a writer likely contributes to uncertainty and reduced reliability in the document examiner's judgment of authenticity"). And this is true in Michigan, where the signatures of immigrants and first-time voters are often flagged for signature mismatch.

### D. Michigan's Townships and Cities Employ Different Signature Matching Procedures.

41.     As one federal court found, the absence of any standards or training to differentiate between natural signature variation and signature mismatches results in "a crazy quilt of conflicting and diverging procedures." *Detzner*, No. 4:16-cv-607, 2016 WL 6090943, at *7.

42.     This is also true in Michigan, where cities and townships use different signature matching procedures for both absentee ballots and ballot applications. For example, many cities and townships in Michigan do not follow any specific signature matching criteria and simply conduct a visual analysis. In contrast, Canton Township has a written, formal process that first examines: (1) whether the signatures are both in cursive or in print; (2) the speed of the signatures; (3) the spacing of the letters; (4) the size and proportion of the signatures; (5) the position

of the signatures; and (6) spelling and punctuation. Then, if there are "clear inconsistencies," clerks in that Township look at other characteristics, such as curves, loops, crosses, dots, and pen lifts to determine if two signatures are sufficiently similar to pass scrutiny.

43. The lack of statewide, uniform guidance regarding signature matching across Michigan's townships and cities has also resulted in significant variations both in absentee ballot and absentee ballot application rejection rates across the State, and in the procedures for notifying voters (if at all) of perceived signature mismatches. Upon information and belief, many cities and townships do not even attempt to provide notice. The City of Rochester Hills, on the other hand, attempts to contact voters through social media, and by telephone, email, or a letter.

44. Furthermore, while Michigan law does not set forth a cure process for absentee ballot applications—and many jurisdictions do not allow voters to cure rejected absentee ballots—some cities and townships have voluntarily adopted cure procedures; though, their processes vary significantly. For example, Independence Township requires voters to submit *both* a new voter registration form and absentee ballot application; Van Buren Township only requires individuals to submit a new voter registration application; and the City of Royal Oak requires voters to fill out a city form. By contrast, Canton Township provides no cure

procedure and simply informs voters that their absentee ballot application "cannot be processed," if a clerk finds a signature mismatch.

45.    The same is true of cure processes for absentee ballots. Clinton and Oakland Townships, for example, allow voters to cure absentee ballots by appearing in-person at the Clerk's office with photo identification and re-signing their ballot envelope. The Cities of Wixom and Livonia do not require photo identification, only that individuals re-sign their absentee ballot or stop by the clerk's office to get a new ballot. Other cities and townships do not allow voters to cure their absentee ballots at all.

46.    These varying signature matching, notification, and curing procedures result in unequal opportunities for absentee voters to exercise their right to vote and cast an effective ballot in an election, which ultimately depends on whatever arbitrary standard is adopted by the city or township in which the voter resides.

**E. The Signature Matching Regime is Not Justified By Any Legitimate State Interest.**

47.    The Signature Matching Regime cannot be justified by any State interest in preventing absentee ballot fraud, as even the State's election officials have found no evidence that such fraud is occurring in Michigan.

48.    The challenged laws are also duplicative of several other safeguards against fraud that are currently in place.[7] For example, all applicants for an absentee ballot must certify—subject to criminal penalties explicitly spelled out on the face of the application, MICH. COMP. LAWS § 168.759(5)—that "the statements in th[e] absent voter ballot application are true." *Id.*; *see also id.* at (8). Michigan law also makes it a felony to forge a signature on an absentee ballot application, *id.*, and these criminal penalties for voter fraud already provide, in the words of former Michigan Director of Elections, Chris Thomas, "a heck of a deterrent."

49.    Michigan law also restricts who can be in possession of a signed absentee ballot application. *See id.* at (4). In particular, only an applicant, her immediate family member, someone in her household, someone whose job it is to normally handle mail, a registered Michigan elector chosen by the applicant to help return her application, or an authorized election official can physically handle her absentee ballot application. *See id.*

50.    And any "registered elector who is requested by the applicant to return his or her absent voter ballot application shall sign the certificate on the absent voter ballot application," MICH. COMP. LAWS § 168.759(6)(d), and must

---

[7] Michigan clerks and the board of election inspectors also verify that the voter is registered to vote in their city or township. MICH. COMP. LAWS § 168.761(1); MICH. COMP. LAWS § 168.766(1)(a).

certify that, among other things, he or she "ha[s] not made any markings on the application"; "ha[s] not altered the application in any way"; "ha[s] not influenced the applicant"; and is "aware that a false statement in th[e] certificate is a violation of Michigan election law." *Id.* at (5). An unauthorized person who distributes and returns absentee ballot applications is guilty of a misdemeanor. *Id.* at (8).

51.    Further, a voter applying for an absentee ballot in-person, in addition to signing the application, MICH. COMP. LAWS § 168.759(4), must show photo identification or sign an Affidavit of Voter Not in Possession of a Picture Identification form. MICH. COMP. LAWS § 168.761(6).

52.    Michigan law also provides many safeguards against fraud for absentee ballots—which voters receive after already having survived the signature matching review applied to absentee ballot applications. *See id.* at (2).

53.    First, the face of the absentee ballot envelope informs voters that "AN ABSENT VOTER WHO KNOWINGLY MAKES A FALSE STATEMENT IS GUILTY OF A MISDEMEANOR." *Id.* at (4).

54.    Anyone who assists a voter in completing an absentee ballot must identify himself, MICH. COMP. LAWS § 168.764a, and that person is subject to criminal felony charges if he makes a knowingly false statement on the envelope.

55.    Michigan law further makes it a crime for anyone other than a voter, the voter's immediate family member, or a "person whose job it is to handle mail,"

"to be in possession of a voted or unvoted absent voter ballot." MICH. COMP. LAWS § 168.764a(5). In other words, possession of an absentee ballot by anyone not specified by statute is a felony. MICH. COMP. LAWS § 168.932(f).

56.     Even the U.S. Postal Service's procedures provide an informal check on potential fraud: ballots that are mailed to voters are returned if the individual does not live at the designated address.[8]

## F. The Signature Matching Regime Has Denied Eligible Michigan Voters The Right To Vote And Threatens To Disenfranchise Many More In Future Elections.

57.     Since the 2012 general election, officials in Michigan have rejected more than 1,200 absentee ballots in total, according to the Election Administration and Voting Survey. These rejections occurred at a time when Michigan law limited absentee voting to senior citizens and those who were unable to vote in-person on Election Day.[9] In 2018, Michigan adopted no-reason absentee voting, thereby eliminating restrictions on who can vote by mail. *See* MICH. CONST. art. II, § 4.

---

[8] *See Election Officials' Manual*, MICH. BUREAU OF ELECTIONS at 6 (February 2019), https://www.michigan.gov/documents/sos/VI_Michigans_Absentee_Voting_Proce ss_265992_7.pdf ("Absentee ballot outgoing envelopes should have the postal instruction 'Return Service Requested' printed on them.").

[9] Under prior law, only those who fit the following criteria were allowed to vote absentee: (1) voters 60 years old or older; (2) voters who were unable to vote in the absence of assistance; (3) voters who were out of town on Election Day, (4) voters in jail; (5) voters who were unable to vote due to religious reasons; or (6) voters who worked as election inspectors outside of their precinct. MICH. COMP. LAWS §

58.     Cities and townships that have held elections recently under the new laws have seen significant increases in absentee voting. In Ann Arbor, for instance, the City saw a 22 percent increase in absentee ballots cast.

59.     Because this growth trend will continue once no-reason absentee voting is implemented throughout Michigan, the number of Michiganders who are at risk of being disenfranchised due to the Signature Matching Regime will increase dramatically absent relief from this Court.

## CLAIMS FOR RELIEF

## COUNT I

**First Amendment and Equal Protection**
**U.S. Const. Amend. I and XIV, 42 U.S.C. § 1983**
**Undue Burden on the Right to Vote**

60.     Plaintiff realleges and incorporates by reference paragraphs 1 through 59, as though fully set forth herein, as well as the proceeding paragraphs.

61.     Under the First Amendment and the Equal Protection Clause of the Fourteenth Amendment, a state cannot utilize election practices that unduly burden the right to vote. A court considering a challenge to a state election law must carefully balance the character and magnitude of injury to the First and Fourteenth Amendment rights that a plaintiff seeks to vindicate against the justifications put

---

168.758 (2017).

forward by the state for the burdens imposed by the rule. *See Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

62.    Here, the Signature Matching Regime imposes a severe burden—outright disenfranchisement—on the right to vote.

63.    Rejecting absentee ballots, as well as denying absentee ballot applications, based solely on an alleged signature mismatch does not serve any legitimate, let alone compelling, state interest, particularly when the State has otherwise verified voters' eligibility to vote, and State laws are already in place to detect and deter fraud.

64.    Thus, the burdens imposed by the Signature Matching Regime on the fundamental right to vote cannot be justified by any alleged benefits of the laws.

65.    Injunctive and declaratory relief are needed to resolve this existing dispute, which presents an actual controversy between the Defendant and Plaintiff, who have adverse legal interests because the Signature Matching Regime subjects Plaintiff to serious, concrete, and irreparable injuries.

## COUNT II

### Equal Protection
### U.S. Const. Amend. XIV, 42 U.S.C. § 1983

66.    Plaintiff realleges and incorporates by reference paragraphs 1 through 65, as though fully set forth herein, as well as the proceeding paragraphs.

67.    The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits a state from "deny[ing] to any person within its jurisdiction the equal protection of the laws." U.S. CONST. amend. XIV, § 1. This constitutional provision requires "that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburn Living Center*, 473 U.S. 432, 439 (1985).

68.    And this applies to voting. "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." *Bush v. Gore*, 531 U.S. 98, 104-05 (2000).

69.    Michigan's standardless and error-prone Signature Matching Regime subjects voters to arbitrary and diverging standards throughout Michigan, depending on the city or township in which they reside.

70.    The Signature Matching Regime does not further any legitimate state interest, much less a compelling state interest, that is sufficiently weighty to justify the disparate treatment of voters.

71.    Injunctive and declaratory relief are needed to resolve this existing dispute, which presents an actual controversy between the Defendant and Plaintiff, who have adverse legal interests because the Signature Matching Regime subjects Plaintiff to serious, concrete, and irreparable injuries.

## **COUNT III**

## Procedural Due Process
## U.S. Const. Amend. XIV, 42 U.S.C. § 1983

72.    Plaintiff realleges and incorporates by reference paragraphs 1 through 71, as though fully set forth herein, as well as the proceeding paragraphs.

73.    The Fourteenth Amendment to the United States Constitution prohibits states from "depriv[ing] any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. This constitutional provision protects the fundamental right to vote and prohibits arbitrary or erroneous deprivation. *See Burdick*, 504 U.S. at 433; *see also Gore*, 531 U.S. at 104-05.

74.    The State, having created an absentee ballot regime, "must administer it in accordance with the Constitution," including with "adequate due process protection." *Martin*, 341 F. Supp. 3d at 1338.

75.    Michigan's Signature Matching Regime violates the Due Process Clause by rejecting voters' absentee ballots (and depriving them of their right to vote) without notice, an opportunity to cure, or any meaningful appeal. Thus, Michigan voters will continue to suffer unlawful disenfranchisement under the laws, absent relief by this Court.

76.    Providing adequate safeguards to prevent the arbitrary and erroneous deprivation of the right to vote would impose no more than a minimal burden on the State, if any.

77.     Injunctive and declaratory relief are needed to resolve this existing dispute, which presents an actual controversy between the Defendant and Plaintiff, who have adverse legal interests because the Signature Matching Regime subjects Plaintiff to serious, concrete, and irreparable injuries.

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment:

(a)     declaring, under the authority granted to this Court by 28 U.S.C. § 2201, that the Signature Matching Regime violates the First and Fourteenth Amendments to the United States Constitution;

(b)     preliminarily and permanently enjoining the Defendant, her respective agents, officers, employees, and successors, and all persons acting in concert with each or any of them, from implementing, enforcing, or giving any effect to the Signature Matching Regime under the authority granted to this Court by Federal Rule of Civil Procedure 65(a) and 28 U.S.C. § 2202;

(c)     awarding Plaintiff its costs, disbursements, and reasonable attorneys' fees incurred in bringing this action pursuant to 42 U.S.C. § 1988 and other applicable laws; and

(d)     granting such other and further relief as the Court deems just and proper.

Dated this 30th day of October, 2019.

Respectfully submitted,

/s/ Marc E. Elias
**MARC E. ELIAS**
/s/ Uzoma N. Nkwonta
**UZOMA N. NKWONTA***

/s/ Andrew Nickelhoff
**ANDREW NICKELHOFF (P 37990)**
Nickelhoff & Widick, PLLC
333 W. Fort St., Suite 1400
Detroit, MI 48226

—

/s/ Jacki L. Anderson                          Telephone: (313) 496-9429
**JACKI L. ANDERSON**                          Facsimile: (313) 965-4602
/s/ K'Shaani Smith                             *anickelhoff@michlabor.legal*
**K'SHAANI SMITH\***
PERKINS COIE LLP
700 Thirteenth St., N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-9959
*melias@perkinscoie.com*
*unkwonta@perkinscoie.com*
*jackianderson@perkinscoie.com*
*kshaanismith@perkinscoie.com*

*Counsel for the Plaintiff*
*\*Applications for Admission to be*
*Submitted or Pending*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on October 30, 2019, the foregoing was filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Respectfully submitted,

/s/ Andrew Nickelhoff
**ANDREW NICKELHOFF (P 37990)**
Nickelhoff & Widick, PLLC
333 W. Fort St., Suite 1400
Detroit, MI 48226
Telephone: (313) 496-9429
Facsimile: (313) 965-4602
*anickelhoff@michlabor.legal*