## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

PRIORITIES USA and MARISSA
ACCARDO,

               Plaintiffs,

     v.

JOCELYN BENSON, in her official
capacity as the Michigan Secretary of State,

               Defendant.

Civil Action No. 3:19-cv-13188-
RHC-APP

Hon. Robert Cleland

Magistrate Anthony A. Patti

## PLAINTIFFS' RESPONSE TO MOTION TO DISMISS AMENDED COMPLAINT

The Secretary of State ("Secretary") has filed a motion under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) to dismiss *only* Priorities USA ("Priorities") for lack of standing, but her Motion should be denied because she admits that Plaintiff Marissa Accardo has standing to bring the exact same claims and agrees that this case should go forward. It is well established that when multiple plaintiffs bring the same claims and seek injunctive relief, only one plaintiff needs to demonstrate Article III and prudential standing. *See Sch. Dist. of Pontiac v. Sec'y of the U.S. Dep't of Educ.*, 584 F.3d 253, 261 (6th Cir. 2009); *see also Citizens Against Casino Gambling v. Hogen*, No. 07-cv-0451S, 2008 WL 2746566 (W.D.N.Y. July 8, 2008).

Even so, Priorities has Article III standing to bring this case. Priorities has sufficiently alleged that Michigan laws requiring election officials, who are

untrained in handwriting or signature analysis, to compare voter signatures and reject absentee ballots and ballot applications for perceived signature mismatches, *see*, *e.g.* Mich. Comp. Laws §§ 168.761(1)-(2), 168.765a(6), 168.766(1)(a), (2) (the "Signature Matching Regime"), impair its mission and, as a result, it must divert resources from its other programs and activities nationwide and within Michigan to combat the effects of these laws. *See Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612 (6th Cir. 2016); *see also* Am. Compl. at ¶ 21, ECF No. 15.

The Secretary's reliance on prudential standing is also misplaced because, again, the Secretary agrees that Plaintiff Accardo has Article III and prudential standing to bring all of the claims in the Amended Complaint. The Supreme Court, moreover, has cast doubt over the "continuing vitality" of dismissals on prudential grounds after a plaintiff has established constitutional standing. *Kiser v. Reitz*, 765 F.3d 601, 607 (6th Cir. 2014) (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)). In any event, even if prudential standing were applied here, Priorities satisfies each requirement because: (1) it has suffered a concrete injury; (2) as an organization dedicated to voter engagement and combating voter suppression, it has a close relationship to the Michigan voters whom it engages and turns out to vote through its various programs, but who are at risk of disenfranchisement due to the Signature Matching Regime; and (3) those voters are hindered from identifying and challenging violations of their constitutional rights due to Michigan election officials' failure to provide notice to voters when rejecting their absentee ballots or applications for an alleged signature mismatch. *See Powers*

2

*v. Ohio*, 499 U.S. 400, 410 (1991); *Fla. State Conference of NAACP v. Browning*, No. 4:07CV-402-SPM/WCS, 2007 WL 9697660, at *3 (N.D. Fla. Dec. 18, 2007).

For these reasons, explained more fully in the brief filed herewith, the Motion to Dismiss should be denied.

Date: February 3, 2020                            Respectfully submitted,

s/ *Marc E. Elias*
Marc E. Elias
Uzoma Nkwonta
Jacki L. Anderson
K'Shaani Smith
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
melias@perkinscoie.com
unkwonta@perkinscoie.com
jackianderson@perkinscoie.com
kshaanismith@perkinscoie.com

Andrew Nickelhoff (P37990)
NICKELHOFF & WIDICK, PLLC
333 W. Fort St., Suite 1400
Detroit, MI 48226
Telephone: (313) 496-9429
Fax: (313) 965-4602
anickelhoff@michlabor.legal

*Counsel for Plaintiffs*

3

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 3, 2020, the foregoing was filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Respectfully submitted,

s/ *Marc E. Elias*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

PRIORITIES USA and MARISSA
ACCARDO,

                    Plaintiffs,

     v.

JOCELYN BENSON, in her official
capacity as the Michigan Secretary of
State,

                 Defendant.

Civil Action No. 3:19-cv-13188-
RHC-APP

Honorable Robert H. Cleland

Magistrate Anthony A. Patti

**PLAINTIFFS' BRIEF IN
SUPPORT OF RESPONSE TO
MOTION TO DISMISS
AMENDED COMPLAINT**

Marc E. Elias
Uzoma Nkwonta
Jacki L. Anderson
K'Shaani Smith
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
melias@perkinscoie.com
unkwonta@perkinscoie.com
jackianderson@perkinscoie.com
kshaanismith@perkinscoie.com

Andrew Nickelhoff (P37990)
NICKELHOFF & WIDICK, PLLC
333 W. Fort St., Suite 1400
Detroit, MI 48226
Telephone: (313) 496-9429
Fax: (313) 965-4602
anickelhoff@michlabor.legal

*Counsel for Plaintiffs*

## ISSUES PRESENTED

The Michigan Secretary of State (the "Secretary") has moved to dismiss only Plaintiff Priorities USA ("Priorities") for lack of standing to challenge the State's signature matching laws for absentee ballots and ballot applications as unconstitutional under the First and Fourteenth Amendments to the U.S. Constitution. Plaintiffs oppose the Secretary's Motion to Dismiss.

1. The Court should deny the Secretary's Motion to Dismiss Priorities because she admits that Plaintiff Marissa Accardo has Article III and prudential standing, and courts have long held that when multiple plaintiffs bring the same claims for injunctive relief, only one plaintiff needs to establish standing for the case to proceed to the merits.

2. Priorities has Article III standing because the Signature Matching Regime impairs Priorities' mission and, as a result, it must divert resources from its other activities to combat the effects of the laws.

3. Prudential considerations (i.e. third-party standing) should not be applied to dismiss a plaintiff that has otherwise demonstrated constitutional standing, and, in any event, Priorities satisfies the prudential standing requirements. As an organization dedicated to voter engagement and combating voter suppression, Priorities has a sufficiently close relationship to, and common interests with, the Michigan voters it serves and engages with such that it may assert the voters' interests, and the Michigan voters affected by the challenged laws are hindered in their ability to challenge Michigan's Signature Matching Regime because they do not receive notice of their rejected absentee ballots and applications.

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

1. *Am. Civil Liberties Union of Ky. v. Grayson Cty., Ky.*, 591 F.3d 837 (6th Cir. 2010)

2. *Citizens Against Casino Gambling v. Hogen*, No. 07-cv-0451S, 2008 WL 2746566 (W.D.N.Y. July 8, 2008)

3. *Fla. State Conference of NAACP v. Browning*, No. 4:07CV-402-SPM/WCS, 2007 WL 9697660 (N.D. Fla. Dec. 18, 2007)

4. *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982)

5. *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118 (2014)

6. *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612 (6th Cir. 2016)

7. *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47 (2006)

8. *Sch. Dist. of City of Pontiac v. Sec'y of the United States Dep't of Educ.*, 584 F.3d 253 (6th Cir. 2009)

9. *Powers v. Ohio*, 499 U.S. 400 (1991)

# TABLE OF CONTENTS

ISSUES PRESENTED.............................................................................. i

CONTROLLING OR MOST APPROPRIATE AUTHORITIES............................ ii

TABLE OF CONTENTS......................................................................... iii

TABLE OF AUTHORITIES ................................................................... iv

INTRODUCTION ................................................................................1

STATEMENT OF FACTS ......................................................................3

LEGAL STANDARD............................................................................5

ARGUMENT .....................................................................................6

  I.  The Secretary's Motion to Dismiss should be denied because all parties agree that Plaintiff Accardo has standing, and the Court has jurisdiction over this action. ...............................................................................................7

  II. Priorities has established Article III standing. ...............................................8

     A. Priorities' diversion of resources and the impairment of its mission caused by the Signature Matching Regime is a concrete and particularized injury sufficient to confer standing. ...................................8

     B. The absence of a recent change in the signature matching laws does not affect the Court's standing inquiry.........................................................11

     C. The injuries alleged in the Complaint are concrete, traceable to the State's conduct, and redressable.............................................................13

  III. Priorities cannot be dismissed on prudential grounds....................................15

CERTIFICATE OF SERVICE ...............................................................21

# TABLE OF AUTHORITIES

### CASES

ACLU v. NSA,
493 F.3d 644 (6th Cir. 2007) ...............................................................7

Am. Canoe Ass'n, Inc. v. City of Louis Water & Sewer Comm'n,
389 F.3d 536 (6th Cir. 2004) ............................................................13

Am. Civil Liberties Union of Ky. v. Grayson Cty., Ky.,
591 F.3d 837 (6th Cir. 2010) ...........................................................7, 8

Arcia v. Fla. Sec'y of State,
772 F.3d 1335 (11th Cir. 2014) .......................................................14

Bay Cty. Democratic Party v. Land,
347 F. Supp. 2d 404 (E.D. Mich. 2004) ...........................................19

Bd. of Educ. of Shelby Cty. Tenn. v. Memphis City Bd. of Educ.,
911 F. Supp. 2d 631 (W.D. Tenn. 2012) ..........................................19

Bell Atl. Corp. v. Twombly,
550 U.S. 544 (2007)............................................................................5

Carey v. Population Servs., Int'l,
431 U.S. 678 (1977)............................................................................8

Courtright v. City of Battle Creek,
839 F.3d 513 (6th Cir. 2016) ............................................................12

Crawford v. Marion Cty. Election Bd.,
472 F.3d 949 (7th Cir. 2007), aff'd, 553 U.S. 181 (2008)..............1, 9

Del. Dep't of Nat. Res. & Envtl. Control v. EPA,
785 F.3d 1 (D.C. Cir. 2015)..............................................................15

Democratic Party of Ga., Inc. v. Crittenden,
347 F. Supp. 3d 1324 (N.D. Ga. 2018).............................................13

Eisenstadt v. Baird,
405 U.S. 438 (1972)..........................................................................18

*Erickson v. Pardus*,
    551 U.S. 89 (2007)................................................................................6

*Fair Elections Ohio v. Husted*,
    770 F.3d 456 (6th Cir. 2014) ....................................................11, 19

*Fla. State Conference of NAACP v. Browning*,
    522 F.3d 1153 (11th Cir. 2008) ...........................................................9

*Fla. State Conference of the NAACP v. Browning*,
    No. 4:07CV-402-SPM/WCS, 2007 WL 9697660 (N.D. Fla. Dec.
    18, 2007) .............................................................................2, 3, 18

*Havens Realty Corporation v. Coleman*,
    455 U.S. 363 (1982)..............................................................................10

*Jacobson v. Lee*,
    No. 4:18cv262-MW/CAS, 2019 WL 6044035 (N.D. Fla. Nov. 15,
    2019) .......................................................................................13

*Kiser v. Reitz*,
    765 F.3d 601 (6th Cir. 2014) ..............................................2, 16, 19

*Lexmark Int'l Inc. v. Static Control Components, Inc.*,
    572 U.S. 118 (2014)........................................................................2, 16

*Liberty Legal Foundation v. National Democratic Party of the USA,*
    *Inc.*, 875 F. Supp. 2d 791 (W.D. Tenn. 2012) ....................................7

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)....................................................................5, 8, 9

*Martin v. Kemp*,
    341 F. Supp. 3d 1326 (N.D. Ga. 2018)........................................12, 13

*McGlone v. Bell*,
    681 F.3d 718 (6th Cir. 2012) ........................................................6, 17

*Mote v. City of Chelsea*,
    284 F. Supp. 3d 863 (E.D. Mich. 2019) .............................................9

*Ne. Ohio Coal. for the Homeless v. Husted*,
    837 F.3d 612 (6th Cir. 2016) ....................................................passim

*Parsons v. U.S. Dep't of Justice*,
    801 F.3d 701 (6th Cir. 2015) ..............................................................................11

*Patel v. United States Citizenship & Immigration Servs.*,
    732 F.3d 633 (6th Cir. 2013) ..............................................................................17

*Phillips v. Snyder*,
    836 F.3d 707 (6th Cir. 2016) ..........................................................................7, 15

*Powers v. Ohio*,
    499 U.S. 400 (1991)..............................................................................16, 17, 18

*RMI Titanium Co. v. Westinghouse Elec. Corp.*,
    78 F.3d 1125 (6th Cir. 1996) ...............................................................................5

*Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*,
    547 U.S. 47 (2006).................................................................................................7

*Sandusky Cty. Democratic Party v. Blackwell*,
    387 F.3d 565 (6th Cir. 2004) ...............................................................................8

*Sch. Dist. of Pontiac v. Sec'y of the U.S. Dep't of Educ.*,
    584 F.3d 253 (6th Cir. 2009) ..........................................................................1, 8

*Singleton v. Wulff*,
    428 U.S. 106 (1976)......................................................................................17, 18

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*,
    429 U.S. 252 (1977)............................................................................................15

*Zynda v. Arwood*,
    175 F. Supp. 3d 791 (E.D. Mich. 2016) ............................................................10

**STATUTES**

42 U.S.C. § 1983......................................................................................................16

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 12(b)(1) ..................................................................5

Federal Rule of Civil Procedure 12(b)(6) ..................................................................5

MICH. CONST. art. II .............................................................................................4, 5

## INTRODUCTION

The Secretary's Motion to Dismiss concedes that the Court has jurisdiction to hear this constitutional challenge to the arbitrary and erroneous rejection of absentee ballots and ballot applications under Michigan's signature matching laws, and that Plaintiff Marissa Accardo has standing. These concessions render the Secretary's motion effectively moot because courts have repeatedly held that for claims seeking injunctive relief, only one plaintiff needs to demonstrate standing, *see Sch. Dist. of Pontiac v. Sec'y of the U.S. Dep't of Educ.*, 584 F.3d 253, 261 (6th Cir. 2009), and the relief the Secretary seeks here has no practical effect on this lawsuit—that is precisely why courts have refused to consider such motions when standing has already been established. *See id*.

But even on the merits, the Secretary's attempt to dismiss Priorities from this case is fundamentally flawed as it misstates the governing legal standards and contradicts the long line of controlling precedent that has repeatedly confirmed that the diversion of resources constitutes an injury sufficient to confer Article III standing. *See, e.g.*, *Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 624 (6th Cir. 2016) ("*NEOCH*"); *Crawford v. Marion Cty. Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007), *aff'd*, 553 U.S. 181 (2008). Priorities, a progressive voter-centric organization that has committed significant resources to voter engagement and turnout efforts, undoubtedly suffers harm to its mission when state laws disenfranchise the voters it seeks to engage and turn out to vote. Priorities has alleged that the law will require it to divert resources to combat the effects of the Signature Matching Regime, and such allegations, at this stage of litigation, are more than

enough to establish standing. The Secretary's Motion fails to grapple with these facts, and instead collapses the summary judgment and pleading standards by refusing to accept Priorities' allegations as true. At the pleading stage, however, allegations of Priorities' diversion of resources satisfies the standing inquiry, and the Secretary has not identified a single authority that states otherwise.

Equally lacking in merit is the Secretary's reliance on prudential considerations to dismiss a single plaintiff from a lawsuit despite the presence of a co-plaintiff whose standing is not in question. When a court has Article III standing to hear a dispute, the Supreme Court has warned that dismissal for prudential reasons is in tension with the principle that a "federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Lexmark Int'l Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014) (citations omitted). And the Sixth Circuit has recognized that this practice—dismissal under prudential rather than constitutional grounds—has been cast into doubt. *Kiser v. Reitz*, 765 F.3d 601, 607 (6th Cir. 2014) (declining to dismiss for prudential ripeness and applying constitutional ripeness instead). The Secretary fails to mention, let alone distinguish, any of these binding decisions that completely undermine her prudential standing argument.

Nonetheless, even if the prudential considerations were relevant here, Priorities has established third-party standing by virtue of its close relationship to the voters it engages, and the absence of any notice requirement in the Signature Matching Regime, which impedes the voters' ability to identify and vindicate violations of their constitutional rights. *See Fla. State Conference of the NAACP v.*

*Browning*, No. 4:07CV-402-SPM/WCS, 2007 WL 9697660, at *3 (N.D. Fla. Dec. 18, 2007). The commonality of interests between Priorities and the voters it serves, and the impediments imposed on individual challenges to the Signature Matching Regime, demonstrate that Priorities is "fully, or very nearly, as effective a proponent" of the constitutional rights asserted in the Amended Complaint. *See id.* Both Plaintiffs, therefore, have standing to pursue this action and the Court should deny the Secretary's Motion to Dismiss Priorities from this case.

## STATEMENT OF FACTS

Priorities is a voter-centric progressive advocacy and service organization. *See* Am. Compl. at ¶ 21, ECF No. 15. Its mission is to engage Americans in the political process by persuading and mobilizing citizens around issues that affect their lives, and to accomplish this mission, Priorities invests significant resources in educating and turning out voters across the country, including in Michigan. In 2019, Priorities committed to investing $100 million or more in voter engagement in four states, including Michigan. *Id.* And in anticipation of the upcoming Michigan state and federal elections, Priorities has already spent over $1,000,000 on advertising and voter education and has deployed a team to work with local organizations, all in an effort to increase turnout and ensure that voters' voices are heard in Michigan. *Id.*

Priorities and Accardo allege that Michigan's Signature Matching Regime unduly burdens the right to vote and violates the Fourteenth Amendment's Equal Protection and Due Process Clauses. *See generally* Am. Compl. Specifically, Michigan's signature matching laws require election officials, who are not trained in handwriting or signature analysis, to compare voters' signatures and exercise

3

unfettered discretion in rejecting absentee ballots and ballot applications for perceived signature mismatches. *Id.* at ¶¶ 25, 27-28, 33-37. And because State law does not prescribe specific guidelines for reviewing voters' signatures or notifying voters of alleged mismatches, the signature review process is standardless, varies from county to county, and results in the rejection of absentee ballots and ballot applications without notice or an opportunity for voters to contest the election official's decision, *id.* at ¶¶ 27, 29, 36-37, or cure any perceived deficiencies in their ballot signatures. *Id.* at ¶¶ 29, 37.

Instances of erroneous absentee ballot rejections—and resulting disenfranchisement—are inevitable under this regime and are all but certain to increase in future elections. Until 2019, absentee voting in Michigan was limited only to voters who fell into one of the following categories: (1) voters who were 60 years of age or older; (2) voters who were unable to vote in the absence of assistance; (3) voters who were out of town on Election Day, (4) voters in jail; (5) voters who were unable to vote due to religious reasons; or (6) voters who worked as election inspectors outside of their precinct. Mich. Comp. Laws § 168.758 (2017). In the 2018 election, however, Michigan voters approved a constitutional amendment that eliminated the restrictions on who can vote by mail and adopted no-reason absentee voting, *see* MICH. CONST. art. II, § 4, thus extending absentee voting to the entire electorate, but also subjecting a significantly larger share of the electorate to the Signature Matching Regime's arbitrary rejection of voters' absentee ballots and ballot applications. *See* Am. Compl. ¶ 13.

To combat the effects of the Signature Matching Regime on the expanded pool of absentee voters, Priorities must divert and expend additional funds and resources in get-out-the-vote ("GOTV"), voter education, mobilization, and turn out efforts, at the expense of its other programs and activities in Michigan and other states around the country. *See id.* at ¶ 21.

## LEGAL STANDARD

The Secretary, citing Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), has moved to dismiss only Priorities from this lawsuit. *See generally* Mot. to Dismiss Am. Compl., ECF No. 17 [hereinafter "Mot."]. A motion to dismiss under Federal Rule of Civil Procedure 12(b)(1) tests the basis of federal subject-matter jurisdiction. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992). A facial attack on a complaint's subject-matter jurisdiction allegations—the only challenge the Secretary mounts here—questions the sufficiency of the allegations and requires a court to accept the allegations as true. *Id.* (citing *United States v. Ritchie*, 15 F.3d 592, 598 (6th Cir. 1994).

A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of a complaint. *RMI Titanium Co. v. Westinghouse Elec. Corp.*, 78 F.3d 1125, 1134 (6th Cir. 1996). A Rule 12(b)(6) motion to dismiss should only be granted if a court determines it is "beyond doubt" that the claimant cannot prove a plausible set of facts that support the claim and would justify relief. *Id*. To clear this bar, the Complaint simply must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In deciding whether a plaintiff has set forth a "plausible" claim, a court must accept the

5

factual allegations in a complaint as true. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007). And in the Sixth Circuit, granting "[a] motion to dismiss for failure to state a claim is disfavored, especially when one's civil rights are at stake." *McGlone v. Bell*, 681 F.3d 718, 728 (6th Cir. 2012) (citations omitted).

## ARGUMENT

The Secretary's Motion to Dismiss lacks merit and should be denied for several reasons. First, it is well-established that in a case where multiple plaintiffs bring the exact same claims and seek injunctive relief, only one plaintiff needs to demonstrate standing, and courts have repeatedly refused to address needless motions that seek to dismiss a single plaintiff without any corresponding change to the causes of action asserted or the relief requested. Second, Priorities' allegations demonstrate that the Signature Matching Regime impairs the organization's mission and forces Priorities to expend additional resources (and divert resources from its other activities) to advance its voter engagement, mobilization and turnout goals. Finally, once a plaintiff has established Article III standing, Supreme Court and Sixth Circuit precedent make clear that the Court should not dismiss any plaintiff on prudential grounds; but even if the Court were to examine prudential standing, Priorities would meet those standards as well by virtue of its close relationship to voters who are impeded—due to inadequate notice of absentee ballot rejections—from identifying and vindicating violations of their constitutional rights. This Court should therefore deny the Secretary's Motion to Dismiss.

**I.  The Secretary's Motion to Dismiss should be denied because all parties agree that Plaintiff Accardo has standing, and the Court has jurisdiction over this action.**

Plaintiff Accardo's undisputed standing to bring this lawsuit means that the Secretary's Motion is effectively moot. It is well established that in a lawsuit seeking solely injunctive relief, only one plaintiff needs to demonstrate Article III standing. *See Am. Civil Liberties Union of Ky. v. Grayson Cty., Ky.*, 591 F.3d 837, 843 (6th Cir. 2010) (citing cases) ("The presence of one party with standing is sufficient."). Even the cases the Secretary cites evince this rule. *See, e.g.*, *Rumsfeld v. Forum for Acad. & Institutional Rights, Inc.*, 547 U.S. 47, 52, n.2 (2006) (describing that "the presence of one party with standing is sufficient to satisfy Article III's case or controversy requirement"); *Phillips v. Snyder*, 836 F.3d 707, 714, n.2 (6th Cir. 2016) ("when one party has standing to bring a claim, the identical claims brought by other parties to the same lawsuit are justiciable"); *NEOCH*, 837 F.3d at 612 (same); *see also* Mot. at 15-16.[1]

Indeed, the Supreme Court and the Sixth Circuit have expressly declined to even entertain the question of whether a specific plaintiff has standing, when the other plaintiffs in the case asserting the same claim clearly do. Under similar circumstances the Supreme Court stated that courts have "no occasion to decide the

---

[1] Both *ACLU v. NSA*, 493 F.3d 644, 652 (6th Cir. 2007) and *Liberty Legal Foundation v. National Democratic Party of the USA, Inc.*, 875 F. Supp. 2d 791, 799 (W.D. Tenn. 2012), *see* Mot. at 20, are distinguishable because in those cases, none of the plaintiffs—not the individual plaintiffs nor the organizations asserting associational standing—had standing to bring any of their claims. Still, the Sixth Circuit made clear that because "it would be a rigorous undertaking to assure that each [plaintiff] has standing," "it is only necessary that one plaintiff has standing." *ACLU*, 493 F.3d at 652.

standing of the other" plaintiffs. *Carey v. Population Servs., Int'l*, 431 U.S. 678, 682 (1977). And the Sixth Circuit has stated that upon concluding that one of the plaintiffs in an action has standing, "there is no need to consider whether the [other] Plaintiffs also have standing." *Sch. Dist. of Pontiac v. Sec'y of the U.S. Dep't of Educ.*, 584 F.3d 253, 261 (6th Cir. 2009); *accord Am. Civil Liberties Union of Ky.*, 591 F.3d at 843 (acknowledging "there [wa]s no need to address the standing of the other plaintiffs" because of existing plaintiffs who had standing). For this reason alone, the Secretary's Motion should be denied.

## II.  Priorities has established Article III standing.

On the merits, the Secretary's standing argument also fails because Priorities has plainly alleged that the Signature Matching Regime frustrates its mission and forces the organization to divert resources to combat the effect of the law on its voter mobilization and turnout efforts. To demonstrate Article III standing, a plaintiff must establish: (1) an injury in fact that is (2) fairly traceable to defendant's conduct and (3) is redressable. *Lujan*, 504 U.S. at 555; *see also Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 573 (6th Cir. 2004). The Secretary focuses her objections to standing on the absence of an injury, but in doing so, ignores the well-pleaded facts in the Amended Complaint and misstates the applicable law.

### A. Priorities' diversion of resources and the impairment of its mission caused by the Signature Matching Regime is a concrete and particularized injury sufficient to confer standing.

As explained in the Amended Complaint, Priorities is a voter-centric organization that engages Americans in the political process by mobilizing,

persuading, and turning out voters. It has devoted significant resources to its voter engagement efforts in Michigan and has deployed a team in the State for that purpose. It logically follows that when a law disenfranchises a significant number of voters, like the Signature Matching Regime, it undermines Priorities' efforts, effectively silencing the voices of eligible citizens whom Priorities seeks to engage and turn out to the polls. This forces Priorities to incur additional expenditures and divert resources from its other activities to combat the disenfranchising effects of the challenged law and advance its mission. Am. Compl. ¶ 21.

These allegations, particularly at the pleading stage, are more than sufficient to confer standing. "[O]n a motion to dismiss[,] [the court] presum[es] that general allegations embrace those specific facts that are necessary to support the claim." *Lujan*, 504 U.S. at 560-61. (alteration in original). Where an organizational plaintiff alleges that it must expend additional funds or reallocate resources from its other activities due to a defendant's unlawful conduct, courts have found repeatedly that such injuries satisfy the Article III requirements. *See, e.g.*, *NEOCH*, 837 F.3d at 624; *Fla. State Conference of NAACP v. Browning*, 522 F.3d 1153, 1165–66 (11th Cir. 2008) (finding organization's anticipation that they will have to divert resources to educate voters on compliance with and to resolve the effects of the challenged law sufficiently created a concrete injury); *Crawford*, 472 F.3d at 951, *aff'd*, 553 U.S. at 181 (finding organizational standing when the Democratic Party was compelled "to devote resources to getting to the polls those of its supporters who would otherwise be discouraged by the new law"); *Mote v. City of Chelsea*, 284 F. Supp. 3d 863, 887 (E.D. Mich. 2019) (holding organization had standing when it diverted resources to

secure the defendant's Americans with Disabilities Act compliance, because "that diversion of resources ha[d] impacted its capacity to provide the range of other services that it offers to disabled persons"); *Zynda v. Arwood*, 175 F. Supp. 3d 791, 804 (E.D. Mich. 2016) (finding organizational standing due to diversion of resources).

The Supreme Court and the Sixth Circuit have also invoked this principle in rejecting similar challenges to organizational standing. In *Havens Realty Corporation v. Coleman*, for instance, the Supreme Court held that a plaintiff-organization had sufficiently alleged standing based on its allegation that it "ha[d] been frustrated" by the defendant's conduct, and as a result, the organization "had to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory steering practices." 455 U.S. 363, 379 (1982). The Court, in finding Article III standing, recognized that these allegations identified "concrete and demonstrable injury to the organization's activities[,] with the consequent drain on the organization's resources," which was "far more than simply a setback to the organization's abstract social interests." *Id.* Similarly, in *NEOCH*, the Sixth Circuit held that an organization committed to assisting the homeless had standing to challenge voter identification and provisional ballot laws based on its "immediate plans to mobilize its limited resources" in response to the laws. 837 F.3d at 624. The organization had previously "focused on educating and assisting the homeless with mail-in voting," but "[g]iven the changes ushered in by [the new laws], [it] determined that its resources [we]re better spent assisting the homeless in participating in early in-person voting." *Id.*

10

*NEOCH* not only confirms that Priorities has standing here by virtue of its reallocation of resources, but it also refused to apply the holding in *Fair Elections Ohio v. Husted,* 770 F.3d 456 (6th Cir. 2014)—the case upon which the Secretary principally (and mistakenly) relies. *See* Mot. at 8. Contrary to the Secretary's claims, the court in *Fair Elections* did not reject the diversion of resources theory, it simply found an absence of proof at the summary judgment phase. *See Fair Elections*, 770 F.3d at 460. The plaintiff in *Fair Elections* failed to provide evidence to support its allegation that the challenged law compelled it to reallocate resources in a way that created an injury for Article III purposes, *see id.*, but here, at the pleading stage, Priorities' allegations must be accepted as true. *See Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 710 (6th Cir. 2015) (stating that "on a motion to dismiss for want of standing, . . . courts must accept as true all material allegations of the complaint"). Thus, granting the Secretary's Motion would require the Court to either disregard Priorities' allegation that it has committed to spending millions on voter engagement and turnout in Michigan, some of which it will have to divert to combat the effects of the Signature Matching Regime; or reject as a matter of law well-established principles of organizational standing based on the diversion of resources and frustration of the organization's mission.

### B. The absence of a recent change in the signature matching laws does not affect the Court's standing inquiry.

The Secretary also attempts to distinguish *NEOCH* by suggesting that, unlike the challenged law in that case, there has been no recent change in Michigan's signature matching procedures. Not only is this fact irrelevant to the issues before

the Court, it omits important context and paints an incomplete picture of the current absentee voting landscape. The Signature Matching Regime is not new—that much is true—but a recently enacted constitutional amendment magnifies its impact: In the 2018 election, Michigan voters approved the adoption of no-excuse absentee voting. Mich. Proposal 18-3 (2018). This Amendment expands the absentee voting option to the entire electorate, but that also means the Signature Matching Regime has the potential to disenfranchise many more voters in the next general election than in prior years. Am. Compl. at ¶ 13; *see Martin v. Kemp*, 341 F. Supp. 3d 1326, 1336 (N.D. Ga. 2018) (recognizing that the issues with signature matching were " exacerbate[ed]" with a "surge[]" in absentee ballot applications). And none of this is hypothetical, as the Secretary suggests. Mot. at 7. That election officials will reject absentee ballots for alleged signature mismatches is borne out by prior elections, including Plaintiff Accardo's experience in the 2018 general election. *See* Am. Compl. at ¶ 20. And the threat of significantly increased absentee ballot rejections logically follows from the likely expansion in absentee voting, the absence of any statewide standards governing the signature matching process, and the lack of adequate safeguards to protect against erroneous disenfranchisement. *See Courtright v. City of Battle Creek*, 839 F.3d 513, 518 (6th Cir. 2016) ("draw[ing] all reasonable inferences in favor of the plaintiff" on a motion to dismiss) (citations omitted).

Even without the inevitable increase in absentee voting, the Secretary does not attempt to explain why a "long-existing" law cannot create an organizational injury in the form of diverted resources, nor does she cite any authority that adopts

such a sweeping rule. *But see Democratic Party of Ga., Inc. v. Crittenden*, 347 F. Supp. 3d 1324, 1337 (N.D. Ga. 2018) (finding "immaterial whether the organizational injury resulted from a change in the law" because "[t]he Plaintiffs' diversion of resources . . . [wa]s all the injury needed to meet the injury-in-fact requirement"). To the contrary, in *Jacobson v. Lee*, No. 4:18cv262-MW/CAS, 2019 WL 6044035 (N.D. Fla. Nov. 15, 2019), the Northern District of Florida held that Priorities demonstrated Article III standing to challenge a state's ballot order law that had been in place for around 70 years because it forced Priorities "to expend and divert additional funds and resources in GOTV, voter persuasion efforts, and other activities in Florida, at the expense of its efforts in other states, in order to combat the effects" of the challenged election law. Compl., *Jacobson v. Lee*, No. 4:18cv262-MW/CAS, ECF No. 1, at ¶ 15; *see also Martin*, 341 F. Supp. 3d at 1334-35 (holding that two civil rights organizations suffered Article III injury because they had to "divert resources to warning voters about the potential risks of filing absentee ballots" and being subject to signature matching, instead of engaging in their normal activities). Priorities' standing in this case is no different.

### C. The injuries alleged in the Complaint are concrete, traceable to the State's conduct, and redressable.

The Amended Complaint alleges direct, concrete injuries caused by the Signature Matching Regime, which are far from the "general grievances" that the Secretary seeks to attribute to Priorities. The organization's voter engagement and turnout efforts are impaired by election practices and procedures that unlawfully disenfranchise voters. *Am. Canoe Ass'n, Inc. v. City of Louis Water & Sewer*

13

*Comm'n*, 389 F.3d 536, 546 (6th Cir. 2004) (finding that organizations' claims were "not based upon a purely ideological or societal interest," but instead "rest[ed] upon their organizational interests which are negatively affected by the defendants'" challenged conduct). It is reasonable (and logical) to infer that the Signature Matching Regime's arbitrary rejection of absentee ballots will render mobilization and turnout gains less effective and will also diminish voter confidence in the electoral system—which makes it harder to engage voters—as demonstrated by the recent report of the Michigan Collegiate Student Advisory Task Force, a nonpartisan advisory group *that the Secretary commissioned*. *See* Michigan Collegiate Student Advisory Task Force, *Report and Recommendations* (Dec. 17, 2019), https://www.michigan.gov/documents/sos/MCSATF_Report_2019_674260_7.pdf Notably, the report explained that "[m]any student voters are concerned that their A[bsentee] ballots may not be counted." *Id.* at 8.

To suggest that the Signature Matching Regime does not impair Priorities' efforts, as the Secretary does, ignores the allegations in the Amended Complaint and defies well-established precedent. *See NEOCH*, 837 F.3d at 624 (finding organization with mission of promoting voting rights had standing to combat the effects of absentee voting laws due to diversion of resources); *Arcia v. Fla. Sec'y of State*, 772 F.3d 1335, 1341 (11th Cir. 2014) (finding organizations with missions to safeguard voting rights had standing to combat the effects of program that purged voter registration rolls due to diversion of resources).

14

### III.    Priorities cannot be dismissed on prudential grounds.

The Court should also reject the Secretary's invitation to explore Priorities' prudential standing because, as the Secretary concedes, Plaintiff Accardo, whose standing is not in question, is authorized to assert each cause of action that Priorities has alleged in the Amended Complaint. Unlike Article III standing, prudential considerations are not constitutional, nor are they absolute; but, like the Article III standing jurisprudence, courts have repeatedly concluded that only one plaintiff with prudential standing is required to assert claims for injunctive relief. *See, e.g.*, *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 263-264 (1977) (declining to determine if an organization had prudential standing, when one individual plaintiff demonstrated third-party standing); *Phillips*, 836 F.3d at 714, n.2 ("when one party has standing to bring a claim, the identical claims brought by other parties to the same lawsuit are justiciable"); *Del. Dep't of Nat. Res. & Envtl. Control v. EPA*, 785 F.3d 1, 8 (D.C. Cir. 2015) ("Because 'constitutional and prudential standing can be shown for at least one plaintiff, we need not consider the standing of the other plaintiffs to raise that claim.'") (citation omitted). Since Plaintiff Accardo asserts all of the same causes of action that Priorities does, her claims resolve all prudential considerations that the Secretary has raised. And, tellingly, the Secretary does not cite a single case in which a court exercised jurisdiction to hear the action yet dismissed a single plaintiff for prudential reasons.

Even without Plaintiff Accardo's involvement, the Secretary's prudential standing argument is irreconcilable with Supreme Court precedent, which states that a dismissal on prudential grounds, after a plaintiff has demonstrated Article III

15

standing, is in "tension" with the Court's admonition that "a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging." *Lexmark Int'l, Inc.*, 572 U.S. at 126 (citations omitted); *Kiser*, 765 F.3d at 606-07 (addressing only the constitutional ripeness inquiry and declining to apply the prudential ripeness framework in light of *Lexmark*). Here, in addition to establishing Article III standing, Priorities has asserted its constitutional claims under 42 U.S.C. § 1983, which authorizes lawsuits by injured parties against officials who, under color of state law, violate any citizen's constitutional rights. This statutory vehicle for vindicating constitutional harms confers jurisdiction upon this Court to hear Priorities' claims. And "[j]ust as a court cannot apply its independent policy judgment to recognize a cause of action that Congress has denied, it cannot limit a cause of action that Congress has created merely because 'prudence' dictates." *Lexmark Int'l, Inc.*, 572 U.S. at 126 (citation omitted). Because the Supreme Court has cast into doubt the continuing vitality of prudential considerations as an independent basis for dismissal when subject matter jurisdiction is otherwise established, this Court should reject the Secretary's attempt to invoke this doctrine here, given that the Court's ability to hear this case is no longer in question.

In any event, prudential standing presents no impediment to Priorities' participation in this case even assuming that the doctrine is applicable. Although courts have previously required litigants to "assert [their] own legal rights and interests," as opposed to the legal rights of third parties, *Powers v. Ohio*, 499 U.S. 400, 410 (1991), this rule is not absolute, nor is it mandated by the constitution and it should not prevent a plaintiff from asserting a claim "where its underlying

16

justifications are absent." *Singleton v. Wulff*, 428 U.S. 106, 113-14 (1976). In particular, litigants may assert legal rights belonging to third parties if they (1) suffer a concrete and particularized injury in fact, (2) have a close relationship to the third party whose rights they assert, and (3) show a hindrance preventing the third party from raising their own claim. *Powers*, 499 U.S. at 410; *McGlone*, 681 F.3d at 729. Thus, "the prudential-standing test 'is not meant to be especially demanding.'" *Patel v. United States Citizenship & Immigration Servs.*, 732 F.3d 633, 635 (6th Cir. 2013),

Priorities satisfies all of these requirements. As explained in detail above, Priorities has adequately alleged a concrete injury in fact, *see* Section II.A., *supra*, and, as a voter-centric organization committed to enhancing voter engagement and turnout, the organization has a close relationship to the Michigan voters who are subject to the Signature Matching Regime. The Supreme Court has recognized that "the relationship between the litigant and the third party may be such that the former is fully, or very nearly, as effective a proponent of the right as the latter," and the "congruence of interests makes it necessary and appropriate" for one litigant to raise the legal rights of others. *Powers*, 499 U.S. at 413-14 (finding relationship between a criminal defendant and juror sufficient to raise equal-protection challenges to race-based peremptory strikes). This principle has been applied to confer third-party standing on an organization to vindicate the rights of *non-member* voters: in *Florida State Conference of NAACP v. Browning*, the Northern District of Florida found that the relationship between an organizational plaintiff and voters "who participate in their voter registration activities" was sufficiently close to confer third-party

17

standing to "sue on behalf of non-member registrants." *See Browning*, 2007 WL 9697660, at *3.

The same considerations confer third-party standing upon Priorities to raise the legal rights of the voters it serves. Just as Michigan absentee voters "have an interest in having their votes count," Priorities "has an interest in empowering" them to do so. *Id*. And because of this congruence of interests, Priorities is "fully, or very nearly, as effective a proponent of the rights" of the Michigan voters that it serves. *Id.*; *see also Powers*, 499 U.S. at 414; *Singleton*, 428 U.S. at 117 (finding physicians had standing to challenge a law excluding abortions from Medicaid coverage); *Eisenstadt v. Baird*, 405 U.S. 438, 445–46 (1972) (finding relationship "between an advocate of the rights of persons to obtain contraceptives and those desirous of doing so" sufficiently close to confer third-party standing).

Michigan voters affected by the Signature Matching Regime are also impeded from protecting their own interests because State law does not require voters to be notified when their absentee ballots or applications are rejected for a signature mismatch. *See* Am. Compl. at ¶¶ 29, 37. Those who are unaware that their constitutional rights have been injured are not in a position to protect those rights, and even when they discover that they have been disenfranchised, it is often too late to do anything about it. That is why courts have held that inadequate notice is the type of impediment to asserting individual rights that supports third-party standing. *See, e.g.*, *Browning*, 2007 WL 9697660, at *3 (holding that voters were "hindered from protecting their own interests . . . [d]ue to inadequacies with notice" and the fact that "many will not know why they were unable to register or how to correct the

18

problem."); *Bd. of Educ. of Shelby Cty. Tenn. v. Memphis City Bd. of Educ.*, 911 F. Supp. 2d 631 (W.D. Tenn. 2012) (finding third-party standing where the harmful impact of the challenged conduct "would be much less likely to come to the attention of [the injured] parents or arouse their concern" than the board of education commissioners that brought suit); *see also Bay Cty. Democratic Party v. Land*, 347 F. Supp. 2d 404, 423 (E.D. Mich. 2004) (finding third-party standing of a political party where the harmed individual voters "will not know about their impending disenfranchisement until election day when it will be too late to challenge the rules of the secretary and director of elections").

Finally, *Fair Elections*, the case upon which the Secretary principally relies, does not compel a different result. There, the court addressed third-party standing in dicta, only after it found that the plaintiff did not provide any evidence of an injury at the summary judgment phase of the case and thus could not establish Article III standing. None of the affected voters were plaintiffs in *Fair Elections*, whereas, here, Plaintiff Accardo alleges that her ballot was previously rejected for signature mismatch and she clearly has standing to vindicate the rights of voters. And the *Fair Elections* court made no attempt to reconcile its statement on prudential standing with Supreme Court jurisprudence that casts doubt over the doctrine's continuing vitality as a basis for dismissal. *See Kiser*, 765 F.3d at 606-07.

In sum, the Secretary's Motion asks this Court to engage in an academic exercise, which has no practical effect on the causes of action asserted in this case, while applying rules that have already been called into question by the Supreme Court. Although Priorities would meet the prudential standing requirements if they

19

applied to this case, *see supra* Section III, prudence dictates that the Secretary's unnecessary motion—and the questionable legal arguments upon which it relies—be denied outright, consistent with the long line of courts that have refused to consider such motions given the presence of at least one plaintiff whose standing is not in question.

For the reasons set forth above, the Secretary's Motion to Dismiss should be denied.

Date: February 3, 2020                    Respectfully submitted,

                                          s/ *Marc E. Elias*
                                          Marc E. Elias
                                          Uzoma Nkwonta
                                          Jacki L. Anderson
                                          K'Shaani Smith
                                          PERKINS COIE LLP
                                          700 Thirteenth Street, N.W., Suite 600
                                          Washington, D.C. 20005-3960
                                          Telephone: (202) 654-6200
                                          Facsimile: (202) 654-6211
                                          melias@perkinscoie.com
                                          unkwonta@perkinscoie.com
                                          jackianderson@perkinscoie.com
                                          kshaanismith@perkinscoie.com

                                          Andrew Nickelhoff (P37990)
                                          NICKELHOFF & WIDICK, PLLC
                                          333 W. Fort St., Suite 1400
                                          Detroit, MI 48226
                                          Telephone: (313) 496-9429
                                          Fax: (313) 965-4602
                                          anickelhoff@michlabor.legal

                                          *Counsel for Plaintiffs*

## **CERTIFICATE OF SERVICE**

I hereby certify that on February 3, 2020, the foregoing was filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Respectfully submitted,

s/ *Marc E. Elias*

21