## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

|  |  |
|---|---|
| PRIORITIES USA and MARISSA ACCARDO,<br><br>　　　　　　　Plaintiffs,<br><br>　v.<br><br>JOCELYN BENSON, in her official capacity as the Michigan Secretary of State,<br><br>　　　　　　　Defendant. | Civil Action No. 3:19-cv-13188-RHC-APP<br><br>Honorable Robert H. Cleland<br><br>Magistrate Anthony A. Patti |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs Priorities USA and Marissa Accardo respectfully ask this Court to issue a preliminary injunction under Federal Rule of Civil Procedure 65(a), enjoining Michigan Secretary of State Jocelyn Benson (the "Secretary") from enforcing Michigan laws that subject absentee ballots and applications to an arbitrary, opaque, and error-prone signature matching process. Mich. Comp. Laws §§ 168.761(1)-(2), 168.765a(6), 168.766(1)(a), (2) (the "Signature Matching Regime"). The Signature Matching Regime requires that all absentee ballots and applications undergo multiple rounds of signature comparisons, during which a ballot or application can be rejected at any point in the process without further review once election officials—who are untrained in signature matching and are given no uniform guidance—determine that the signature on a voter's absentee ballot envelope or application does not match the voter's signature in the election officials' records.

*See id.* Even worse, election officials are not required to notify voters of a mismatch determination, nor does the law give voters an opportunity to contest or cure an alleged mismatch. This inevitably results in the wrongful disenfranchisement of eligible Michigan voters, like Plaintiff Accardo, in violation of her constitutional rights.

As set out more fully in the accompanying brief in support of their Motion, Plaintiffs are entitled to preliminary injunctive relief because they meet each of the four relevant factors. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). First, Plaintiffs are likely to prevail on the merits of their constitutional claims. The Signature Matching Regime imposes an undue burden on the constitutional right to vote by subjecting absentee voters to an error-prone signature examination process that imposes arbitrary and differential standards on similarly-situated absentee voters and results in the wrongful rejection of lawfully cast ballots. *See*, *e.g.*, *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312 (11th Cir. 2019); *Bryanton v. Johnson*, 902 F. Supp. 2d 983, 999 (E.D. Mich. 2012). The Signature Matching Regime also violates the Due Process Clause because it denies absentee voters the right to participate in the electoral process—by discarding their ballots based on a subjective signature comparison—without notice or an opportunity to contest or cure a signature mismatch determination. *See*, *e.g.*, *Martin v. Kemp*, 341 F. Supp. 3d 1326, 1338–40 (N.D. Ga. 2018); *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 215 (D.N.H. 2018); *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354, 1358 (D. Ariz. 1990).

Second, absent injunctive relief, Plaintiff Accardo and many other Michigan voters will suffer irreparable harm as a result of the constitutional injuries imposed by the Signature Matching Regime, all of which are necessarily irreparable. *See, e.g., Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012); *Mich. State A. Philip Randolph Inst. v. Johnson*, 209 F. Supp. 3d 935, 954, (E.D. Mich. 2016). And Priorities USA will suffer irreparable harm because the Signature Matching Regime impairs its mission and forces the organization to divert resources in response. *See, e.g.*, *Ind. State Conference of NAACP v. Lawson*, 326 F. Supp. 3d 646, 662 (S.D. Ind. 2018).

Finally, the public interest and the balance of the equities favor an injunction of the Signature Matching Regime's arbitrary rejection of absentee ballots and applications. Plaintiffs' requested relief enforces the constitutional right to vote and thus serves the public interest by "permitting as many qualified voters to vote as possible." *Obama for Am.*, 697 F.3d at 436-37. And it imposes only minimal burdens, if any, on the State, which has significantly less-burdensome means at its disposal to verify voter eligibility without arbitrarily denying the franchise to eligible citizens.

For these reasons and those set forth in their accompanying brief in support of their Motion for Preliminary Injunction, Plaintiffs respectfully request that the Court grant their Motion and enter an Order:

(1)     Preliminarily enjoining the Secretary and all local election officials, who are similarly bound by the Court's Order pursuant to Federal Rule of Civil Procedure 65(d)(2), from implementing or enforcing the Signature

- 3 -

Matching Regime to reject any voter's absentee ballot or application unless the voter receives advance notice, by phone, text, and email, along with an opportunity to cure their ballot or application in accordance with the procedures set forth below;

(2)    Ordering the Secretary to issue a directive to all local election officials, who are similarly bound by the Court's Order pursuant to Federal Rule of Civil Procedure 65(d)(2), attaching the Court's Order and instructing them to: (i) provide notice of all signature mismatch determinations, whether on an absentee ballot or an application, to the absentee voter or applicant by phone, text, and email within 24 hours of such determination; (ii) implement a cure procedure for absentee ballots that allows voters, up to 6 days after Election Day (or after receiving notice of a signature mismatch, whichever is later), to contest the decision or confirm the authenticity of their ballot, at which point the voter's absentee ballot must be accepted and counted if it is otherwise eligible; (iii) implement a cure procedure for absentee ballot applications that allows voters up to 14 days after receiving notice of a signature mismatch to submit a new application or confirm the authenticity of their original application, at which point the voter's application must be accepted and an absentee ballot must be issued if the voter is otherwise eligible; (iv) ensure that all signature mismatch determinations are confirmed by the board of election inspectors, and ensure that decisions to reject absentee ballots or applications for signature mismatch are made by the unanimous vote of the board of election

- 4 -

inspectors, and that ballots and applications should not be rejected unless the board finds, beyond a reasonable doubt, that the compared signatures do not match; and

(3)     Ordering the Secretary to provide formal signature matching training for all city and township clerks and all boards of election inspectors.

Pursuant to Local Rule 7.1(a), Plaintiffs' counsel conferred with the Secretary's counsel and explained the nature of the Motion and its legal basis. Plaintiffs' counsel requested, but did not obtain, concurrence in the relief sought.

Date: February 25, 2020

Andrew Nickelhoff (P37990)
NICKELHOFF & WIDICK, PLLC
333 W. Fort St., Suite 1400
Detroit, MI 48226
Telephone: (313) 496-9429
Fax: (313) 965-4602
anickelhoff@michlabor.legal

Respectfully submitted,

s/ *Marc E. Elias*
Marc E. Elias
Uzoma Nkwonta
Jacki L. Anderson
K'Shaani Smith
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
melias@perkinscoie.com
unkwonta@perkinscoie.com
jackianderson@perkinscoie.com
kshaanismith@perkinscoie.com

*Counsel for Plaintiffs*

## <u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on February 25, 2020, the foregoing was filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Respectfully submitted,

s/ *Marc E. Elias*

# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MICHIGAN
# SOUTHERN DIVISION

| | |
|---|---|
| PRIORITIES USA and MARISSA ACCARDO,<br><br>             Plaintiffs,<br><br>    v.<br><br>JOCELYN BENSON, in her official capacity as the Michigan Secretary of State,<br><br>             Defendant. | Civil Action No. 3:19-cv-13188-RHC-APP<br><br>Honorable Robert H. Cleland<br><br>Magistrate Anthony A. Patti<br><br>**PLAINTIFFS' BRIEF IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION** |

Marc E. Elias
Uzoma Nkwonta
Jacki L. Anderson
K'Shaani Smith
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
melias@perkinscoie.com
unkwonta@perkinscoie.com
jackianderson@perkinscoie.com
kshaanismith@perkinscoie.com

*Counsel for Plaintiffs*

Andrew Nickelhoff (P37990)
NICKELHOFF & WIDICK, PLLC
333 W. Fort St., Suite 1400
Detroit, MI 48226
Telephone: (313) 496-9429
Fax: (313) 965-4602
anickelhoff@michlabor.legal

## ISSUE PRESENTED

Should this Court issue a preliminary injunction preventing the Secretary from enforcing Michigan's Signature Matching Regime, which is error-prone, arbitrary, and lacks procedural safeguards to prevent the erroneous rejection of validly-cast ballots, all in violation of the Fourteenth Amendment's Equal Protection and Due Process Clauses?

Plaintiffs' Answer: Yes

## CONTROLLING OR MOST APPROPRIATE AUTHORITIES

1. *Bryanton v. Johnson*, 902 F. Supp. 2d 983 (E.D. Mich. 2012)

2. *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312 (11th Cir. 2019)

3. *Democratic Exec. Comm. of Fla. v. Lee*, 347 F. Supp. 3d 1017 (N.D. Fla. 2018)

4. *Fla. Democratic Party v. Detzner*, No. 4:16-cv-607, 2016 WL 6090943 (N.D. Fla.  Oct.  16,  2016)

5. *League of United Latin Am. Citizens of Iowa v. Pate*, No. CVCV056403, 2019 WL 6358335 (Iowa Dist. Sept. 30, 2019)

6. *Martin v. Kemp*, 341 F. Supp. 3d 1326 (N.D. Ga. 2018)

7. *Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580 (6th Cir. 2012)

8. *Obama for Am. v. Husted*, 697 F.3d 423 (6th Cir. 2012)

9. *Saucedo v. Gardner*, 335 F. Supp. 3d 202 (D.N.H. 2018)

10. *Raetzel v. Parks/Bellemont Absentee Election Bd.*, 762 F. Supp. 1354 (D. Ariz. 1990)

11. *Zessar v. Helander*, No. 05 C 1917, 2006 WL 642646 (N.D. Ill. Mar. 13, 2006)

**TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................1

BACKGROUND ...................................................................................................3

  A. Michigan's arbitrary, multi-step signature review process for absentee ballots. ...................................................................................................4

  B. Forensic examiners have all but universally concluded that signature matching by untrained individuals is highly error-prone. ..............................6

  C. Many disenfranchised absentee voters in Michigan are neither provided notice nor an opportunity to contest or cure signature mismatch determinations. ...................................................................................................9

  D. The Signature Matching Regime has already disenfranchised thousands of ballots and could affect many more voters in future elections. ....................10

ARGUMENT ...................................................................................................11

  A. Plaintiffs are likely to succeed on the merits. ...............................................12

    1. The Signature Matching Regime burdens the right to vote and violates the Equal Protection Clause. ...................................................................12

      i. The Signature Matching Regime disenfranchises voters and thus imposes a severe burden on the right to vote. ...................................13

      ii. The Signature Matching Regime subjects voters to arbitrary and differential treatment. ........................................................................16

      iii. No government interest justifies the Signature Matching Regime's burdens on the right to vote. .................................................................18

    2. Rejecting absentee ballots without notice or an opportunity to cure or appeal violates the Due Process Clause. ................................................20

  B. Plaintiffs will suffer irreparable harm absent injunctive relief. ....................22

  C. The balance of the equities tips decidedly in Plaintiffs' favor, and a preliminary injunction would serve the public interest. ..................................24

CONCLUSION ...................................................................................................25

# TABLE OF AUTHORITIES

## CASES

*Bay Cty. Democratic Party v. Land*,
    347 F. Supp. 2d 404 (E.D. Mich. 2004) ............................................................20

*Bays v. City of Fairborn*,
    668 F.3d 814 (6th Cir. 2012) ..............................................................24

*Bryanton v. Johnson*,
    902 F. Supp. 2d 983 (E.D. Mich. 2012) ....................................................12, 17

*Bush v. Gore*,
    531 U.S. 98 (2000)..............................................................12, 16, 17

*Caspar v. Snyder*,
    77 F. Supp. 3d 616 (E.D. Mich. 2015) ..............................................................12

*Democratic Exec. Comm. of Fla. v. Lee*,
    347 F. Supp. 3d 1017 (N.D. Fla. 2018) ......................................................passim

*Dunn v. Blumstein*,
    405 U.S. 330 (1972)..............................................................17

*Fla. Democratic Party v. Lee*,
    No. 4:16-cv-607, 2016 WL 6090943 (N.D. Fla. Oct. 16, 2016) .................14, 18

*Ga. Coal. for the People's Agenda v. Kemp*,
    347 F. Supp. 3d 1251 (N.D. Ga. 2018) ..............................................................23

*Harper v. Va. Bd. of Elections*,
    383 U.S. 663 (1966)..............................................................17

*Ind. State Conference of the NAACP v. Lawson*,
    326 F. Supp. 3d 646 (S.D. Ind. 2018)..............................................................23

*League of United Latin Am. Citizens of Iowa v. Pate*,
    No. CVCV056403 (Iowa D. Ct. Polk Cty. July 24, 2018) ......................7, 17, 19

*Martin v. Kemp*,
    341 F. Supp. 3d 1326 (M.D. Ga. 2018) ..........................................15, 21, 22, 23

*Mathews v. Eldridge*,
    424 U.S. 319 (1976)............................................................................20

*Mich. State A. Philip Randolph Inst. v. Johnson*,
    209 F. Supp. 3d 935 (E.D. Mich. 2016) ...........................................22

*Miller v. Johnson*,
    515 U.S. 900 (1995)....................................................................12, 21

*Ne. Ohio Coal. For the Homeless v. Husted*,
    696 F.3d 580 (6th Cir. 2012) ...........................................................13

*Ne. Ohio Coal. for the Homeless v. Husted*,
    837 F.3d 612 (6th Cir. 2016) ...........................................................19

*Obama for Am. v. Husted*,
    697 F.3d 423 (6th Cir. 2012) ...................................................passim

*Priorities USA v. State*,
    No. SC97470, 2020 WL 203129 (Mo. Jan. 14, 2020).........................7

*Reynolds v. Sims*,
    377 U.S. 533 (1964)...........................................................................25

*Saucedo v. Gardner*,
    335 F. Supp. 3d 202 (D.N.H. 2018)...........................................passim

*Serv. Emps. Intern. Union, Local 1 v. Husted*,
    906 F. Supp. 2d 745 (S.D. Ohio 2012) .............................................13

*Stein v. Thomas*,
    222 F. Supp. 3d 539 (E.D. Mich. 2016) ...........................................12

*Warren v. City of Athens*,
    411 F.3d 697 (6th Cir. 2005) ...........................................................20

*Zessar v. Helander*,
    No. 05 C 1917, 2006 WL 642646 (N.D. Ill. Mar. 13, 2006).............21

## STATUTES AND OTHER AUTHORITIES

10 ILCS 5/19-8(g-5)...............................................................................10

Co. Rev. Stat. § 31-10-910.3(5)(c)(II)(A) ...............................................9

Mich. Comp Laws § 168.761.................................................................5, 21

Mich. Comp Laws § 168.765a..................................................................21

Mich. Comp Laws § 168.766....................................................................21

Mich. Comp. Laws § 168.509q...................................................................8

Mich. Comp. Laws § 168.523a...................................................................9

Mich. Comp. Laws § 168.758.................................................................3, 10

Mich. Comp. Laws § 168.759....................................................................19

Mich. Comp. Laws § 168.761....................................................................19

Mich. Comp. Laws § 168.764....................................................................19

Mich. Comp. Laws § 168.766.....................................................1, 5, 15, 16

Mich. Comp. Laws § 168.767......................................................................5

Mich. Comp. Laws § 168.813.................................................................9, 22

Mich. Comp. Laws § 257.307......................................................................8

Mich. Const., art. II, § 4(1)(g)................................................................4, 21

O.C.G.A. § 21-2-386(a)(1)(C) .................................................................10

Ore. Rev. Stat. § 254.431(2)(b)..................................................................9

Wash. Admin. Code § 434-261-050(3) .......................................................9

Wash. Rev. Code Ann. § 29A.60.190..........................................................9

## INTRODUCTION

Plaintiff Marissa Accardo, a student at Grand Valley State University, did everything right when casting her absentee ballot in 2018: she diligently filled it out, signed the envelope affirmation, and returned it on time. Little did she know that her absentee ballot would be rejected, because of an alleged signature mismatch, by election officials untrained in signature analysis, and without any prior notice or an opportunity to contest the wrongful determination or cure whatever discrepancy election officials claimed to have identified in her ballot signature. And she is not alone. Each election, a significant number of absentee ballots are rejected in Michigan under an opaque, arbitrary signature-matching scheme mandated by State law.

The problem with Michigan's signature verification process is that it lacks any procedural safeguards to prevent erroneous determinations; the inevitable result is the disenfranchisement of eligible voters like Ms. Accardo. It is well documented that signature matching is highly error-prone, particularly when conducted by election officials who lack the training and resources to distinguish reliably between minor variations in authentic signatures on one hand, and inauthentic signatures on the other. And yet, Michigan law requires all absentee ballots and applications to undergo multiple rounds of signature matching, during which a ballot can be rejected at any point in the process without further review once election officials—who, again, are untrained in signature matching—determine that the signature on a voter's absentee ballot envelope or application does not match the voter's signature in the Qualified Voter File, or, if that signature is not available, the voter's registration or

"master" card signature (collectively, the "reference signature"). *See* Mich. Comp. Laws §§ 168.761(1)-(2), 168.765a(6), 168.766(1)(a), (2) (the "Signature Matching Regime"). Even worse, election officials are not required to notify voters of a mismatch determination, nor does the law give voters an opportunity to contest or cure an alleged mismatch.

As one federal court put it, signature matching, when employed for the purpose of verifying ballots, is inherently "a questionable practice" and "may lead to unconstitutional disenfranchisement." *Democratic Exec. Comm. of Fla. v. Lee*, 347 F. Supp. 3d 1017, 1030 (N.D. Fla. 2018). That is why courts across the country have almost uniformly found similar signature matching regimes unconstitutional. *See infra* pp. 13–15, 18–19, 22; Am. Compl. ¶ 12, ECF No. 15. This case is no different. Michigan's Signature Matching Regime threatens to disenfranchise many more voters in the upcoming 2020 general election—the first general election in which Michigan will allow no-reason absentee voting—when the State will likely see a significant spike in the number of absentee ballots cast. Absent injunctive relief, Plaintiffs, along with many Michigan voters, will suffer irreparable harm, and both the balance of the equities and the public interest favor Plaintiffs' requested injunction, which protects the constitutional right to vote from arbitrary and wrongful deprivation and promotes public confidence in Michigan's elections.

Because each of the relevant factors strongly favors preliminary injunctive relief, Plaintiffs request that the Court grant their Motion and issue an order enjoining the enforcement of the Signature Matching Regime to the extent it permits the rejection of absentee ballots and applications without advance notice and an

adequate opportunity for voters to contest or cure signature mismatch rejections, and instruct the Secretary to implement procedural safeguards, as set forth in Plaintiffs' Motion, to prevent the erroneous rejection of eligible and validly-cast ballots.

## BACKGROUND

Absentee voting in Michigan is a process fraught with uncertainty and saddled with outdated restrictions on the franchise. Introduced in 1954, this method of voting historically has been the exception, rather than the norm, available only to voters who either: (1) were 60 years of age or older; or (2) were unable to vote in the absence of assistance; or (3) were out of town on Election Day; or (4) were incarcerated; or (5) were unable to vote due to religious reasons; or (6) worked as election inspectors outside of their precinct. Mich. Comp. Laws § 168.758 (2017). Yet, even when voters met the absentee voting requirements and followed all instructions, they faced an impermissible risk of disenfranchisement: Michigan's signature matching laws, adopted in 1991, require election officials to compare signatures on absentee ballots and applications with the voter's reference signature in order to verify the voter's identity. *See* Mich. Comp. Laws §§ 168.758, 168.767 (1991). As forensic examination expert Dr. Linton Mohammed and others have almost uniformly recognized, signature analysis, as a means of verifying voters, is highly unreliable especially when conducted by untrained examiners. Declaration of Linton Mohammed, Ex. A ¶¶ 30–39. Yet over a thousand absentee ballots have been

rejected through signature matching over the last several elections, and countless more since the law was first implemented.[1]

Because signature matching is highly error-prone, election officials often get it wrong, as they did with Plaintiff Accardo in the 2018 midterm election. Since then, Michigan has implemented, pursuant to a voter-approved constitutional amendment, no-reason absentee voting, which is all but certain to expand the use of absentee ballots. *See* Mich. Const., art. II, § 4(1)(g). But as long as outdated methods of voter verification, i.e., signature matching, remain on the books, a corresponding increase in the incidence of erroneous signature mismatch rejections is inevitable.

### A.   Michigan's arbitrary, multi-step signature review process for absentee ballots.

A Michigan voter who wishes to cast an absentee ballot must first submit a written and signed application to their city or township clerk. But before the voter receives a ballot, the clerk must compare the signature on the absentee ballot application to the voter's reference signature—the digitized signature in the

---

[1] The number of rejected absentee ballots was calculated using Election Administration and Voting Survey data from 2012 through 2018. *See* 2018 Election Administration and Voting Survey, ELECTION ASSISTANCE COMMISSION, https://www.eac.gov/research-and-data/election-administration-voting-survey; 2016 Election Administration and Voting Survey, ELECTION ASSISTANCE COMMISSION, https://www.eac.gov/research-and-data/election-administration-voting-survey; 2014 Election Administration and Voting Survey, ELECTION ASSISTANCE COMMISSION, https://www.eac.gov/research-and-data/2014-election-administration-voting-survey; 2012 Election Administration and Voting Survey, ELECTION ASSISTANCE COMMISSION, https://www.eac.gov/research-and-data/2012-election-administration-voting-survey.

Qualified Voter File, or, if that signature is not available, the voter's registration or "master" card signature. Mich. Comp. Laws § 168.761(2). If the clerk determines that the signature on the application matches the voter's reference signature, the clerk will provide the voter an absentee ballot. *Id.* § 168.761(1). But if the clerk determines that the signatures do not match, the clerk must reject the application and the voter will neither receive an absentee ballot nor, in many cases, will they receive any notification that their ballot will not be issued. *Id.*

Assuming a voter gets past the initial round of signature-matching, election officials must repeat the same process for the voter's marked absentee ballot. Upon receipt of the ballot, the clerk must compare the signature on the absentee ballot envelope with the voter's reference signature. *See* Mich. Comp. Laws § 168.767.[2] And if the voter's ballot survives the clerk's signature review, the board of election inspectors conducts yet another round of signature matching and has authority to reject any ballot that it deems to have a mismatched signature, notwithstanding any prior approval by the clerk. *See* Mich. Comp. Laws § 168.766(1)(a).

The clerks and boards of election inspectors have the final say in determining whether an absentee ballot is counted, yet their signature review is not guided by any

---

[2] The most recent version of the Election Officials' Manual also requires that "the signature appearing on the [absentee voter] certificate must be checked against the signature on the applicant's [absentee ballot] application" which was previously "checked against the signature on the applicant's voter registration record to verify the applicant's identity," or the Qualified Voter File. *Election Officials' Manual*, MICH. BUREAU OF ELECTIONS at 5, 8 (November 2019), https://www.michigan.gov/documents/sos/VI_Michigans_Absentee_Voting_Proc ess_265992_7.pdf.

identifiable standards, nor are they required to undergo any training in signature matching. Absent from the law are any procedures or guidelines that would inform an election official's attempt to determine whether two signatures are sufficiently similar to satisfy the matching requirement, and the Secretary's Office has been equally silent on this issue. In fact, no one really knows how Michigan election officials go about determining whether a signature on an absentee ballot is sufficiently similar to the voter's reference signature to withstand scrutiny. The absence of any uniform or objective standards for reviewing signatures effectively invites cities and townships—and even individual election officials—to apply their own subjective criteria in determining whether a voter's signature is authentic, leaving Michigan voters exposed to inconsistent practices and procedures depending on the city or township in which they reside, and in some cases, the specific official who reviews their signatures.

### B. Forensic examiners have all but universally concluded that signature matching by untrained individuals is highly error-prone.

The lack of training and absence of uniform guidelines under Michigan law exacerbate the risk of disenfranchisement because signature matching already suffers from an inherent flaw: it is highly error-prone. Dr. Mohammed, a forensic document examiner with extensive experience in handwriting and signature identification, whose opinion has been credited by multiple courts examining signature matching practices in election administration, explains in his declaration that untrained election officials not only demonstrate high rates of errors when conducting signature matching, but that these errors are more likely to result in the

rejection of authentic signatures than they are to yield a false positive (i.e., the acceptance of inauthentic or forged signatures).[3] Ex. A ¶¶ 29–32.

The consensus among forensic examination experts is that signature matching procedures like those required under Michigan law are unreliable. *Id.* ¶¶ 43–48. For one, election officials often rely on a single reference signature for comparison. *Id.* ¶¶ 44–45. But the generally accepted practice among professional examiners is to review multiple signatures, which allows them to account for the natural variations in an individual's signatures that can occur for a variety of reasons entirely unrelated to fraud, including the signer's age, physical and mental condition, accidental occurrences, inherent changes in neuromuscular coordination, among others. *Id.* ¶¶ 36–39, 44. Voters who are elderly, disabled, or have health conditions, for instance, are more likely to experience natural variations in their signatures because they tend to have less pen control than most writers. *Id.* ¶ 37. Similarly, signatures of young voters or those for whom English is a second language are more likely to show great degrees of natural variation due to their newly developed signature style. *Id.* ¶¶ 38–39. As one City Clerk acknowledged, the signatures of immigrants and first-time voters in particular are often flagged for mismatches. Declaration of Uzoma Nkwonta ("Nkwonta Decl."), Ex. 3. To an untrained examiner, the natural

---

[3] *See, e.g.*, *Saucedo v. Gardner*, 335 F. Supp. 3d 202, 217-18 (D.N.H. 2018) (relying on Dr. Mohammed's testimony in finding New Hampshire's signature matching laws unconstitutional); *Priorities USA v. State*, No. SC97470, 2020 WL 203129, at *20 (Mo. Jan. 14, 2020) (same); Ruling on Mot. for Temporary Restraining Order, *League of United Latin Am. Citizens of Iowa v. Pate*, No. CVCV056403, at *7 (Iowa D. Ct. Polk Cty. July 24, 2018) (same).

variations in an individual's signature are often misperceived as a sign of something more sinister. Ex. A ¶¶ 33–34, 37–39.

The potential for error is further enhanced when the reference signatures maintained in the Qualified Voter File are digitized, which occurs when a voter signs a voter registration form on an electronic pad at the Secretary's or city or township clerk's office. *See* Mich. Comp. Laws §§ 168.509q (g), 257.307(2). Because a digitized signature's resolution, whether it is being viewed on a monitor or as a printed item, and the writing instruments used to create it, all affect the signature's appearance, any comparison to a wet-ink signature entered on a (paper) absentee ballot or application is likely to reveal some variation. Ex. A ¶¶ 46–47.

Experienced forensic examiners often account for these factors when making signature comparisons, but untrained election officials simply lack the skills and resources to match signatures consistently with a high degree of accuracy. *Id.* ¶ 35. To become a forensic document examiner, one must, at a minimum, obtain two years of full-time training with an experienced document examiner, and over a year of specific training in the examination of signatures and handwriting; learn the science of signature examination; gain experience in reviewing signatures; and be tested for proficiency. *Id.* But in Michigan, election officials with no training at all use signature matching to verify the identities of absentee voters, and in some cases to deny them the right to vote, despite the fact that lay examiners are over 3.5 times more likely to misidentify matching or non-matching signatures. *Id.* ¶¶ 31–32.

**C.    Many disenfranchised absentee voters in Michigan are neither provided notice nor an opportunity to contest or cure signature mismatch determinations.**

Once a voter's absentee ballot or application is rejected for signature mismatch, disenfranchisement is all but certain. Michigan law does not require a clerk to inform a voter of a rejected absentee ballot or application, nor does it require election officials to provide the voter with an opportunity to cure the perceived defect. To make matters worse, the law provides no mechanism by which voters may contest a wrongful determination, thus conferring upon election officials unfettered discretion in deciding which absentee ballots to count and rendering their decisions unreviewable. So even if a voter learned that their absentee ballot was rejected—though in many cases they are not made aware of the election official's decision—there is nothing they can do to ensure that their vote is counted before the 8:00 p.m. Election Day deadline for receipt of absentee ballots. *See* Declaration of Marissa Accardo, Ex. B ¶ 7.

This arbitrary and disenfranchising regime exists notwithstanding the availability of other obvious procedural mechanisms that provide voters an opportunity to cure or contest the erroneous rejection of their ballots. Indeed, Michigan law provides voters who cast a provisional ballot up to 6 days after Election Day to cure their ballots by providing necessary documentation. *See* Mich. Comp. Laws §§ 168.523a, 168.813. And other jurisdictions have ensured that voters receive notice and time to cure their absentee ballots following a signature mismatch rejection even after polls close. *See, e.g.*, Wash. Rev. Code Ann. § 29A.60.190 & Wash. Admin. Code § 434-261-050(3) (allowing cure up to 20 days after a general

election); Co. Rev. Stat. § 31-10-910.3(5)(c)(II)(A) (8 days after election); Ore. Rev. Stat. § 254.431(2)(b) (14 days after election); 10 ILCS 5/19-8(g-5) ("on or before the 14th day after the election"); O.C.G.A. § 21-2-386(a)(1)(C) (3 days after election). Yet, inexplicably, Michigan denies the same opportunity to its absentee voters.

> **D.   The Signature Matching Regime has already disenfranchised thousands of ballots and could affect many more voters in future elections.**

The result of this Signature Matching Regime—coupled with the lack of notice or opportunity to cure—is the inevitable disenfranchisement of Michigan voters, the scope of which will likely eclipse prior elections. In 2018, according to the Election Administration and Voting Survey, election officials rejected approximately 300 absentee ballots cast by Michigan voters, including Plaintiff Accardo, for alleged signature mismatches, along with untold numbers of absentee ballot applications. And since 2012, officials in Michigan refused to count more than 1,200 absentee ballots citing signature mismatches, which again does not include the rejection of ballot applications. *See supra* note 1. These rejections occurred at a time when Michigan law restricted absentee voting to those who met the limited criteria set forth in Mich. Comp. Laws § 168.758 (2017). *See supra* pp. 3. But the recent introduction of no-reason absentee voting, *see* Mich. Const., art. II, § 4(g), means that the State will likely see a significant increase in absentee ballots, and an accompanying increase in the number of voters disenfranchised by

Michigan's arbitrary and error-prone Signature Matching Regime in the 2020 elections and beyond, absent injunction relief from this Court.[4]

## ARGUMENT

The Signature Matching Regime subjects Michigan's absentee voters to arbitrary, error-prone procedures that invariably result in the unconstitutional disenfranchisement of eligible citizens. This scheme violates the Equal Protection and Due Process Clauses of the Fourteenth Amendment, and the Secretary cannot identify any legitimate public interest that justifies denying the franchise to eligible voters without notice or an opportunity to cure. As explained in further detail below, Plaintiffs satisfy all of the preliminary injunction factors and are entitled to their requested relief because: (1) Plaintiffs are likely to prevail on the merits; (2) the constitutional injuries, including the deprivation of the fundamental right to vote, imposed by the Signature Matching Regime are irreparable; (3) the harm to Plaintiffs outweighs any injury the Secretary may suffer because of the injunction; and (4) granting Plaintiffs' requested relief would serve the public interest. *See Winter*, 555 U.S. at 20. In applying these factors, courts in this circuit have recognized that

---

[4] Absentee voting in Michigan has already spiked since the recent adoption of no-reason absentee voting. *See* Kathleen Gray, *Clerks facing challenges with absentee voting skyrocketing in Michigan elections*, DETROIT FREE PRESS (Nov. 15, 2019), https://www.freep.com/story/news/politics/2019/11/15/absentee-voting-surges-michigan-creating-challenges-local-clerks/2533356001/ (noting that 82 percent of voters cast absentee ballots in the August primary election in Rochester Hills, and 67 and 51.2 percent of voters in Westland and Warren, respectively). And the surge in absentee voting is expected to continue. Kathleen Gray, *supra*; Beth LeBlanc, *No-reason absentee voting could change 2020 Michigan campaigns*, THE DETROIT NEWS (Dec. 26, 2019), https://www.detroitnews.com/story/news/politics/2019/12/27/no-reason-absentee-voting-could-change-2020-campaigns-michigan/2750516001/.

"where a plaintiff demonstrates a likelihood of success on a claimed constitutional violation, a preliminary injunction is nearly always appropriate." *Caspar v. Snyder*, 77 F. Supp. 3d 616, 623 (E.D. Mich. 2015) (citing *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)).

> **A.  Plaintiffs are likely to succeed on the merits.**
>
> > **1.  The Signature Matching Regime burdens the right to vote and violates the Equal Protection Clause.**

The right to vote is fundamental and forms the bedrock of representative democracy. *Stein v. Thomas*, 222 F. Supp. 3d 539, 544 (E.D. Mich. 2016). It applies not just to the initial allocation of the franchise, but also to the manner of its exercise, and is enforced through the Fourteenth Amendment's Equal Protection Clause, which stands as a bulwark against state action that impedes access to the ballot box or subjects individuals (and their votes) to arbitrary and disparate treatment. *See Bush v. Gore*, 531 U.S. 98, 104-05 (2000); *Obama for Am.*, 697 F.3d at 429. When the challenged law imposes a severe burden on the right to vote, a reviewing court must apply strict scrutiny, and the State bears the burden to demonstrate that the law is "narrowly tailored to achieve a compelling interest." *Miller v. Johnson*, 515 U.S. 900, 920 (1995). But even less severe burdens, however slight, "must be justified by relevant and legitimate state interests 'sufficiently weighty to justify the limitation.'" *Bryanton v. Johnson*, 902 F. Supp. 2d 983 (E.D. Mich. 2012) (citations omitted). This requires the Court to "weigh the character and magnitude of the asserted injury to the rights . . . the plaintiff seeks to vindicate against the precise interests put forward by the State as justifications for the burden imposed by its rule, taking into

consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Obama for Am.*, 697 F.3d at 429 (quotation marks omitted).

> **i.      The Signature Matching Regime disenfranchises voters and thus imposes a severe burden on the right to vote.**

Plaintiffs are likely to succeed on their claim that the Signature Matching Regime severely burdens the right to vote because it wrongfully denies certain absentee voters the opportunity to cast an effective ballot based on arbitrary and deeply flawed procedures. *See Serv. Emps. Intern. Union, Local 1 v. Husted*, 906 F. Supp. 2d 745, 755 (S.D. Ohio 2012) (holding disqualification of ballots "owing to poll-worker error" is a substantial burden on the right to vote). Among forensic examination experts, there is little dispute that signature matching, especially when conducted by untrained election officials, as is the case in Michigan, is highly error-prone. Ex. A ¶¶ 30–32; *see also Saucedo*, 335 F. Supp. 3d at 217 ("[T]he task of handwriting analysis by laypersons . . . is fraught with error."). And as explained above, *see supra* pp. 6–8, untrained reviewers in particular have a greater propensity to misidentify authentic signatures as forgeries and will erroneously reject validly cast absentee ballots and applications. Ex. A ¶¶ 31–41.

The result of this regime is outright disenfranchisement, which, as federal courts in this circuit and around the country have repeatedly recognized, imposes a substantial burden on the right to vote. *See, e.g.*, *Ne. Ohio Coal. for the Homeless v. Husted*, 696 F.3d 580, 593 (6th Cir. 2012); *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1321. As one court explained in enjoining a similar signature matching

scheme, "[i]f disenfranchising thousands of eligible voters does not amount to a severe burden on the right to vote, then this Court is at a loss as to what does." *Fla. Democratic Party v. Lee*, No. 4:16-cv-607, 2016 WL 6090943, at *6 (N.D. Fla. Oct. 16, 2016) (finding signature matching law unconstitutional).

Recent rulings from the Northern District of Florida and the Eleventh Circuit are particularly instructive here. In *Democratic Executive Committee of Florida*, the Northern District of Florida held that the State's amended signature matching laws (the prior version of which the court previously struck down in *Florida Democratic Party v. Detzner*, 2016 WL 6090943, at *7) were unconstitutional notwithstanding the addition of a two-day cure window for voters whose ballots were flagged for signature mismatch. 347 F. Supp. 3d at 1030. "The injury," the court held, was "the deprivation of the right to vote based on a standardless determination made by laypeople." *Id*. The court further recognized that "[t]here are dozens of reasons a signature mismatch may occur, even when the individual signing is in fact the voter," and that the signature matching regime is "even more problematic" when conducted by "counties [that] have discretion to apply their own standards and procedures." *Id*. The Eleventh Circuit, in denying a motion for injunction pending appeal, agreed that "Florida's signature-match scheme subject[ed] vote-by-mail and provisional electors to the risk of disenfranchisement" due to the absence of uniform standards, minimum qualifications, and training of those engaged in signature matching, and the fact that signatures can change for entirely innocent reasons. *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1319-20. The court concluded that the signature matching scheme burdened voters "with the risk that their ballots will incorrectly be rejected

for signature mismatch," and that the two-day cure period for rejected ballots was inadequate, in part because many voters did not learn about the signature mismatch determination until after the cure period expired. *See id*. at 1320-21.

Michigan's Signature Matching Regime shares many of the same characteristics that rendered these laws unconstitutional, and in some respects is even worse. Where Florida's most recently enjoined signature matching laws provided a two-day cure period that the courts deemed insufficient, Michigan offers no cure procedure whatsoever. Moreover, a federal court in Georgia found the State's signature matching law unconstitutional even though it required prompt notice to voters following the rejection of a ballot or application; yet Michigan law requires none. *See Martin v. Kemp*, 341 F. Supp. 3d 1326, 1330 (M.D. Ga. 2018).

Michigan's scheme also multiplies the risk of future disenfranchisement because election officials must conduct several rounds of signature matching, and a perceived mismatch at any point in the process is fatal to a voter's absentee ballot. First, the clerk must compare a voter's absentee ballot application signature with the reference signature; then the clerk must conduct the same analysis (comparing the absentee ballot signature to the reference signature) when the voter submits their absentee ballot; after which point, the clerk must also compare the voter's signature from the absentee ballot to the signature on the absentee ballot application. *See* Mich. Comp. Laws §§ 168.761(1)-(2), 168.765a(6), 168.766(1)(a), (2). And if multiple rounds of arbitrary, standardless signature matching were not enough, a ballot that survives the clerk's signature examinations must be reviewed yet again by a board of election inspectors that conducts its own signature match analysis, comparing the

signature on the absentee ballot with the signature on the voter's registration record. *See* Mich. Comp. Laws § 168.766(1)(a). To be sure, each successive examination is a one-way street: it exists not to overturn erroneous signature mismatch determinations, but rather to identify and reject additional ballots that may have survived prior review, but which, upon the third or fourth inspection, do not appear (to the eyes of an untrained examiner) to agree with the voter's reference signature or the signature on the voter's absentee ballot application. Under this multilayered review process, Michigan law maximizes opportunities to reject absentee ballots, yet inexplicably provides no procedural safeguards that would protect voters against arbitrary disenfranchisement, which severely burdens the right to vote.

### ii.     The Signature Matching Regime subjects voters to arbitrary and differential treatment.

The State's enforcement of the Signature Matching Regime also violates voters' constitutional rights by subjecting their ballots to arbitrary and differential treatment. In *Bush v. Gore*, the U.S. Supreme Court held that "the right to vote is protected" not only in the "initial allocation of the franchise," but also to "the manner of its exercise," and that "once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another." 531 U.S. at 104–05; *see also Obama for Am.*, 697 F.3d at 436. The Court found that the use of "standardless manual recounts" violated the Equal Protection Clause as election officials "had no previous training in handling and interpreting ballots," *Bush*, 531 U.S. at 109, and different counties used "varying standards to determine what was a legal vote," *id.* at 107. This long-standing principle of equality

- 16 -

in the exercise of the franchise predates *Bush v. Gore* and protects the constitutional right of citizens "to participate in elections on an equal basis with other citizens in the jurisdiction." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972); *see also Harper v. Va. Bd. of Elections*, 383 U.S. 663 (1966).

Like the procedures challenged in Florida's manual recount, Michigan's Signature Matching Regime is "[in]consistent with [the] obligation to avoid arbitrary and disparate treatment of the members of [the] electorate." *Bush*, 531 U.S. at 105. Election officials' subjective and arbitrary signature matching procedures vary by city and township, and even by the particular election official who examines the signatures. *See supra* pp. 5–6. Each reviewer will inevitably apply varying criteria and levels of scrutiny, and voters in some cities and townships will face higher barriers to having their vote counted than others, which burdens the right to vote and violates the Equal Protection Clause. *See Democratic Exec. Comm. of Fla.*, 915 F.3d at 1319-20 (finding constitutionally problematic Florida's signature matching system that lacked uniform standards and "qualifications or training for those who engage in the job," which "virtually guarantee[d] a crazy quilt of enforcement of the requirement from county to county"); *Bryanton*, 902 F. Supp. 2d at 999 (holding that "inadequate[ly] trained" election officials and the absence of "statewide standards" subjected voters to "arbitrary and disparate treatment" that "infring[ed] on the Equal Protection right of all citizens to access the polls"); *see also League of United Latin Am. Citizens of Iowa*, 2019 WL 6358335, at *16 (holding Iowa's signature matching regime's arbitrary treatment of voters violated the state constitution's Equal Protection Clause).

- 17 -

iii.     No government interest justifies the Signature
Matching Regime's burdens on the right to vote.

Given the severity of the burden imposed by arbitrary disenfranchisement, the Court should apply strict scrutiny—which requires the State to demonstrate that the challenged law is narrowly tailored to advance a compelling state interest—and Michigan's Signature Matching Regime cannot survive this test. *Fla. Democratic Party*, 2016 WL 6090943, at *6 (holding signature matching law unconstitutional and applying strict scrutiny because it imposed a "severe burden on the right to vote"). But even under a less stringent level of scrutiny, the Signature Matching Regime's disparate treatment of absentee voters and erroneous rejection of absentee ballots would fail constitutional review. *See Democratic Exec. Comm. of Fla.*, 915 F.3d at 1321.

While the State may point to a general interest in fraud prevention, as other jurisdictions have done, to justify the burdens imposed by the Signature Matching Regime, several courts have rejected that argument in enjoining similar signature matching procedures, and for good reason. *See, e.g.*, *Democratic Exec. Comm. of Fla.*, 347 F. Supp. 3d at 1030 (holding interest in fraud prevention did not justify burdens on the right to vote imposed by Florida's signature matching law); *Fla. Democratic Party*, 2016 WL 6090943, at *6 (same); *Saucedo*, 335 F. Supp. 3d at 220 (same). Because signature matching is highly error-prone, particularly when conducted by untrained examiners, "the fact that a[n] []election official may decide a voter's signature provided with her ballot does not match her signature in the state's records does not necessarily mean her vote is fraudulent and should not be

counted." *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1315. And there is no reason to believe that providing notification to voters or a process to contest and cure an alleged mismatch would impede the government's efforts to prevent absentee voter fraud. *See id*. at 1325 (concluding that "the state's interest in preventing fraud is not in conflict with voters' interest in having their legitimately-cast ballots counted"); *Saucedo*, 335 F. Supp. 3d at 220 (explaining, in a due process challenge, that "the court fails to see how additional procedures [to safeguard the right to vote] would harm these interests" in preventing voter fraud); *see also League of United Latin Am. Citizens of Iowa*, 2019 WL 6358335, at \*17.

Any concerns about absentee ballot fraud, moreover, can be addressed through less burdensome means. For instance, all applicants and voters must certify, subject to criminal penalties spelled out on the face of absentee ballot envelopes and applications, that the statements made therein are true. *See* Mich. Comp. Laws §§ 168.759(5), 168.761(4), 168.764(a). And it is a felony to forge a signature on an absentee ballot application. *Id*.[5] These provisions, among others, guard against fraud and protect the integrity of the voting process, and the State's desire for more deterrence cannot justify the burdens imposed by an opaque, arbitrarily-enforced signature matching requirement. *See Ne. Ohio Coal. for the Homeless v. Husted*, 837 F.3d 612, 633 (6th Cir. 2016) (rejecting argument that "preventing voter fraud by mail ma[de] it 'necessary to burden' the plaintiffs' voting rights" when the previous

---

[5] Further, a voter applying for an absentee ballot in-person, in addition to signing the application, Mich. Comp. Laws § 168.759(4), must show photo identification or sign an Affidavit of Voter Not in Possession of a Picture Identification form. *Id.* § 168.761(6).

regime gave boards flexibility to investigate fraud); *Bay Cty. Democratic Party v. Land*, 347 F. Supp. 2d 404, 437 (E.D. Mich. 2004) (rejecting voter fraud prevention rationale and noting that Michigan had criminal statutes in place to prosecute voter fraud); *see also Democratic Exec. Comm. of Fla.*, 915 F.3d at 1323 ("[T]he threat of penalty of perjury [] guard[s] against dishonesty and fraud" in the absentee voting context).

In sum, the interests likely to be identified by the State cannot justify the arbitrary and erroneous rejection of validly-cast ballots, and Plaintiffs are likely to demonstrate that the Signature Matching Regime imposes an unconstitutional burden on the right to vote.

### 2. Rejecting absentee ballots without notice or an opportunity to cure or appeal violates the Due Process Clause.

Michigan's failure to provide any pre- or post-deprivation process also violates the procedural due process rights of voters whose absentee ballots or applications are rejected solely due to a signature mismatch. In asserting a due process claim, Plaintiffs must—as they do here—satisfy a two-step inquiry: first, they must show that a protected liberty or property interest is at stake, and that State action deprives voters of that interest without adequate process. *See Warren v. City of Athens*, 411 F.3d 697, 708–09 (6th Cir. 2005). When determining what process is appropriate or "due," courts consider the three factors delineated in *Mathews v. Eldridge*, 424 U.S. 319 (1976): (1) the private interest that will be affected by the government action; (2) the risk of the erroneous deprivation of the interest, and the probable value of additional procedures; and (3) the government interest in the

regulation, including the burdens imposed by additional procedures. *See, e.g.*, *Martin*, 341 F. Supp. 3d at 1338–40; *Saucedo*, 335 F. Supp. 3d at 215.

Plaintiffs easily satisfy the first threshold factor—requiring a protected liberty interest at stake—because the rejection of absentee ballots disenfranchises eligible citizens and implicates the constitutional right to vote, universally recognized among federal courts as a liberty interest protected by the Fourteenth Amendment's Due Process Clause. *See, e.g.*, *Miller*, 348 F. Supp. 2d at 921. The Michigan Constitution further guarantees the right of eligible Michigan citizens to vote absentee. Mich. Const., art. II, § 4(g). "Having created an absentee voter regime through which qualified voters can exercise their fundamental right to vote, the State must now provide absentee voters with constitutionally adequate due process protection." *Martin*, 341 F. Supp. 3d at 1338; *Zessar v. Helander*, No. 05 C 1917, 2006 WL 642646 at *6–*7 (N.D. Ill. Mar. 13, 2006).

For the second phase of the due process inquiry, Michigan law makes plain that election officials may deprive Michigan voters of a protected liberty interest (i.e., the constitutional right to vote and the right to vote absentee) without notice or an opportunity to cure. *See* Mich. Comp Laws §§ 168.761(1)-(2), 168.765a(6), 168.766(1)-(2). Due process, however, requires that "the affected individual [] be forewarned and afforded an opportunity to be heard at a meaningful time and in a meaningful manner." *Saucedo*, 335 F. Supp. 3d at 214; *see also id.* at 219–20. Michigan law provides neither. *See supra* pp. 9–10.

Furthermore, pre-deprivation notice or an opportunity to cure or contest a signature mismatch determination would impose little or no additional burden on the

State. In fact, Michigan already provides notice and an opportunity to cure provisional ballots up to 6 days after Election Day by presenting certain documentation. Mich. Comp. Laws § 168.813; *see supra* pp. 9. And several states with signature matching requirements manage to provide opportunities for voters to cure rejected ballots—some of which were implemented after courts found that the failure to provide such measures violated due process. *See supra* pp. 13–15; *see also Martin*, 341 F. Supp. 3d at 1340–41 (finding it "not so burdensome" to require a process for signature matching that mirrors Georgia's treatment of provisional ballots); *Saucedo*, 335 F. Supp. 3d at 221 (concluding that pre-rejection procedures to safeguard the right to vote "would not entail significant administrative burdens," especially when "procedures already exist which could be readily extended"). Michigan's failure to extend procedural protections to absentee voters is thus unjustifiable, and Plaintiffs are likely to succeed in demonstrating that the Signature Matching Regime violates the Due Process Clause.

**B.    Plaintiffs will suffer irreparable harm absent injunctive relief.**

It is well-settled that the violation of constitutional rights, especially the right to vote, constitutes irreparable harm. *See, e.g., Obama for Am.*, 697 F.3d at 436; *Mich. State A. Philip Randolph Inst. v. Johnson*, 209 F. Supp. 3d 935, 954, (E.D. Mich. 2016). Absent injunctive relief, Plaintiff Accardo and other absentee voters in Michigan, some of whom have already been disenfranchised in prior elections under the Signature Matching Regime, will be forced to submit their ballots (and their constitutional right to vote) to an arbitrary and standardless verification procedure that poses a significant threat of disenfranchisement and will likely deny some

eligible citizens the opportunity to vote in the 2020 election and beyond. *See* Ex. B ¶¶ 6-7; Declaration of Charles E. Turner, Ex. D ¶ 6; *supra* pp. 13–17, 21–22; *see also Democratic Exec. Comm. of Fla.*, 347 F. Supp. 3d at 1031 (finding irreparable harm caused by signature matching); *Martin*, 341 F. Supp. 3d. at 1340 (same).

Priorities USA will also suffer irreparable harm. The Signature Matching Regime frustrates the organization's mission to build a progressive movement by engaging and mobilizing voters and increasing voter turnout, *see* Am. Compl. at ¶ 21, and it forces the organization to divert resources to its get-out-the-vote, voter education, mobilization, and turnout activities in Michigan, at the expense of its other programs, in order to combat the effects of the law on Michiganders, including young and minority voters. *See* Declaration of Guy Cecil, Ex. C ¶¶ 8–10. Courts have repeatedly recognized that an organization forced to divert resources in response to an unconstitutional law suffers irreparable harm. *See, e.g.*, *Ind. State Conference of the NAACP v. Lawson*, 326 F. Supp. 3d 646, 662 (S.D. Ind. 2018) ("Where organizational plaintiffs are compelled to divert and expend their resources to address a defendant's allegedly wrongful conduct, this is 'enough to . . . [demonstrate] irreparable harm.'") (citation omitted); *Ga. Coal. for the  People's Agenda v. Kemp*, 347 F. Supp. 3d 1251, 1268 (N.D. Ga. 2018) (same).

Once the election has come and gone, "the rejected electors will have been disenfranchised without a future opportunity to cast their votes" and Priorities will have diverted its limited resources to combat disenfranchisement. *Martin*, 341 F. Supp. 3d at 1340; *see also Ga. Coal. for the  People's Agenda*, 347 F. Supp. 3d at

1268 (recognizing that "mobilization opportunities cannot be remedied once lost").
Unless this Court grants injunctive relief, Plaintiffs will suffer irreparable harm.

**C.    The balance of the equities tips decidedly in Plaintiffs' favor, and a preliminary injunction would serve the public interest.**

The balance of the equities and the public interest also favor Plaintiffs' requested injunction. On one end of the scale, Michigan voters face severe burdens to the most fundamental of constitutional rights, the right to vote. *See supra* pp. 13–17, 21–22. And on the other end, adopting common-sense procedures, including, for example, uniform standards, training of election officials, required notification of a mismatch determination, and an opportunity for voters to contest or cure an alleged mismatch, would in no way undermine the State's interests, but instead would prevent the arbitrary and wrongful deprivation of the right to vote. *See Bays v. City of Fairborn*, 668 F.3d 814, 825 (6th Cir. 2012) ("[I]f the plaintiff shows a substantial likelihood that the challenged law is unconstitutional, no substantial harm to others can be said to inhere its enjoinment.").

A preliminary injunction would also advance the public interest, which is best served by "permitting as many qualified voters to vote as possible." *Obama for Am.*, 697 F.3d at 437. As one court recognized, "public knowledge that legitimate votes were not counted due to no fault of the voters—and with no reasonable notice to the voters . . . and no opportunity to correct that situation—would be harmful to the public's perception of [an] election's legitimacy." *Democratic Exec. Comm. of Fla.*, 915 F.3d at 1327. This has proven to be the case in Michigan, where the student advisory task force recently commissioned by the Secretary of State reported

concern among "many students" that "their [absentee] ballots may not be counted." Nkwonta Decl. Ex. 4; *see also* Ex. B ¶ 8; Ex. D ¶ 8. The Constitution favors the robust exchange of ideas that occurs when eligible citizens exercise their constitutional right to vote and election officials count each vote equally. *See Reynolds v. Sims*, 377 U.S. 533, 557 (1964). Because the Signature Matching Regime undermines rather than promotes voter confidence in the electoral system, an injunction of this unconstitutional law serves the public interest.

## CONCLUSION

For the reasons set forth above, Plaintiffs respectfully request that the Court issue the requested preliminary injunction.

Date: February 25, 2020

Andrew Nickelhoff (P37990)
Nickelhoff & Widick, PLLC
333 W. Fort St., Suite 1400
Detroit, MI 48226
Telephone: (313) 496-9429
Fax: (313) 965-4602
anickelhoff@michlabor.legal

*Counsel for the Plaintiff*

Respectfully submitted,

s/ *Marc E. Elias*
Marc E. Elias
Uzoma Nkwonta
Jacki L. Anderson
K'Shaani Smith
PERKINS COIE LLP
700 Thirteenth Street, N.W., Suite 600
Washington, D.C. 20005-3960
Telephone: (202) 654-6200
Facsimile: (202) 654-6211
melias@perkinscoie.com
unkwonta@perkinscoie.com
jackianderson@perkinscoie.com
kshaanismith@perkinscoie.com

- 25 -

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on February 25, 2020, the foregoing was filed with the Clerk of the Court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

Respectfully submitted,

s/ *Marc E. Elias*