# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

PRIORITIES USA, and
MARISSA ACCARDO,

     Plaintiffs,

v.                                Case No. 19-13188

JOCELYN BENSON,

     Defendant.

_____/

## OPINION AND ORDER DENYING DEFENDANT'S MOTION TO DISMISS AND GRANTING MOTION TO INTERVENE

Plaintiffs Priorities USA ("Priorities") and Marissa Accardo bring this action against Defendant Jocelyn Benson in her official capacity as Michigan Secretary of State under 42 U.S.C. § 1983. (ECF No. 15.) Plaintiffs challenge Michigan's "signature matching" laws, whereby election officials inspect and verify purported signatures for voters' absentee ballot applications and absentee ballots. Plaintiffs allege that signature matching constitutes an undue burden on the right to vote, in violation of the First and Fourteenth Amendments, and violates the equal protection and procedural due process guarantees of the Fourteenth Amendment. (*Id.*, PageID.162-65, ¶¶ 62-79.)

The Michigan Senate and the Michigan House of Representatives ("Legislature") move for mandatory and permissive intervention. (ECF No. 7.) They argue that Defendant does not adequately represent their interests in defending Michigan's election laws. (*Id.*) Plaintiffs filed a response and the Legislature has replied. (ECF Nos. 11, 14.)

Defendant moves to dismiss Priorities under Federal Rule of Civil Procedure 12(b)(1) and (6) for lack of standing. (ECF No. 17.) Defendant does not contest Accardo's standing. Plaintiffs responded to Defendant's motion, but Defendant did not reply. (ECF Nos. 18.)

The court finds a hearing unnecessary. E.D. Mich. L.R. 7.1(f)(2). For the reasons provided below, the court will deny Defendant's motion to dismiss and grant the Legislature's motion to intervene.

## I.  BACKGROUND

The following are facts as alleged in Plaintiff's complaint. In a motion to dismiss, the court accepts Plaintiff's factual allegations as true but makes no overt finding as to truth or falsity. *Kardules v. City of Columbus*, 95 F.3d 1335, 1346 (6th Cir. 1996).

Accardo is a nineteen-year-old resident of Canton Township, Michigan. (ECF No. 15, PageID.147-48, ¶ 20.) She is currently a college student. (*Id.*) In high school and at the age of seventeen, Accardo registered to vote in Michigan and signed a voter registration card. (*Id.*) When away for college, Accardo received an absentee ballot for the 2018 November general election. (*Id.*) After completing the ballot and providing a signature, Accardo filed the ballot with the Canton Township clerk. (*Id.*) The clerk then reviewed Accardo's signature under procedures established by Michigan's signature matching laws. (*Id.*, PageID.140-41, ¶ 1.) The clerk determined that the ballot's signature did not adequately match the signature on the voter registration card. (*Id.*) Accardo's vote was discarded and not counted. (*Id.*) Accardo plans to vote again in the 2020 November general election. (*Id.*)

Voters who wish to vote in elections in Michigan must register. Mich. Comp. Laws § 168.491. Voter registration applications require a signature. Mich. Comp. Laws. § 168.495(o). If voters wish to vote absentee, they must also sign and complete an absentee ballot application. Mich. Comp. Laws § 168.759(3)-(4). Upon submission to a city or township clerk, a voter's signature is compared to a digitized signature on file in a government database. (*Id.*, PageID.141, ¶ 2 (citing Mich. Comp. Laws § 168.761(1)-(2)).) If there is no such signature on an electronic source, the clerk compares the voter's absentee ballot application signature with a "master card," generally taken from the voter's voter registration application. (*Id.*) The clerk rejects absentee ballot applications if signatures are found to differ. (*Id.*)

Once a voter's absentee ballot application is accepted, the voter can proceed to vote absentee. (*Id.*, PageID.141-42, ¶ 3.) Voters must complete and sign absentee ballots and then submit them to the city or township clerk. (*Id.* (citing Mich. Comp. Laws § 168.765a(6)).) The clerk receives absentee ballots and checks if the signature matches the voter's signature on file, again taken from either the government's electronic database or the voter's voter registration application. (*Id.*) If the signatures do not match, the ballot is rejected. (*Id.*) Ballots are then transferred to a board of election inspectors to conduct a second review. (*Id.*, PageID.142, ¶ 4 (citing Mich. Comp. Laws § 168.766(1)(a), (2)).) If the ballot signature does not match the voter's digitized signature or the voter's "master card," the vote is rejected. (*Id.*) At some point in the absentee ballot verification process, Accardo's ballot was rejected. (*Id.*, ¶ 5.)

Priorities is a self-identified "progressive advocacy and service organization." (*Id.*, PageID.148-49, ¶ 21.) The group "works to help educate, mobilize, and turn out voters

across the country" and spends millions of dollars doing so. (*Id.*) In Michigan alone, the group plans "to invest $100 million" and has already expended "over $1,000,000." (*Id.*) Michigan's signature matching laws "frustrat[e]" these efforts. (*Id.*) Priorities "is expending and diverting additional funds" in response to the possibility that some voters it intends to mobilize will have ballots rejected due to an inability to pass Michigan's signature-matching process. (*Id.*)

## II. STANDARDS

### A. Standing

Article III Section 2 of the United States Constitution limits judicial power to cases and controversies. *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547 (2016). "Standing to sue is a doctrine rooted in the traditional understanding of a case and controversy." *Id.* "The Supreme Court has enumerated the following elements necessary to establish standing:

> First, Plaintiff must have suffered an injury in fact–an invasion of a legally-protected interest which is (a) concrete and particularized; and (b) actual or imminent, not conjectural or hypothetical. Second, there must be a causal connection between the injury and the conduct complained of–the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision."

*Parsons v. U.S. Dept. of Justice*, 801 F.3d 701, 710 (6th Cir. 2015) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)). When reviewing a motion to dismiss on the basis of standing, the court "must accept as true all material allegations of the complaint, and must construe the complaint in favor of the complaining party." *Kardules*, 95 F.3d at 1346 (quoting *Warth v. Seldin*, 422 U.S. 490, 501 (1975)). The plaintiff does, however, bear the burden of establishing standing and must "clearly

allege facts demonstrating each element." *Parsons*, 801 F.3d at 710 (quoting *Warth*, 422 U.S. at 518).

## B. Intervention

Federal Rule of Civil Procedure 24 provides an avenue for parties to intervene into ongoing lawsuits. There are two forms of intervention, permissive and mandatory. *Id.* Overall, the requirements for intervention "should be broadly construed in favor of potential intervenors." *Stupak-Thrall v. Glickman*, 226 F.3d 467, 472-73 (6th Cir. 2000) (quoting *Purnell v. City of Akron*, 925 F.2d 941, 951 (6th Cir. 1991)).

Permissive intervention has a less exacting standard than mandatory intervention and courts are given greater discretion to decide motions for permissive intervention. *Grubbs v. Norris*, 870 F.2d 343, 345 (6th Cir. 1989) (quoting *Stringfellow v. Concerned Neighbors*, 480 U.S. 370, 382 (1987)) ("[A] district court has less discretion to limit the participation of an intervenor of right than of a permissive intervenor."). "On a timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Fed. R. Civ. P. 24(b)(1). Further, "[i]n exercising its discretion, the court must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3).

The proposed intervenor has the burden to "establish that the motion for intervention is timely and alleges at least one common question of law or fact." *United States v. Michigan*, 424 F.3d 438, 445 (6th Cir. 2005) (citing *Michigan State AFL-CIO v. Miller*, 103 F.3d 1240, 1248 (6th Cir. 1997)). "[T]he district court must then balance undue delay and prejudice to the original parties, if any, and any other relevant factors

to determine, whether, in the court's discretion, intervention should be allowed." *Id.* The court's decision on permissive intervention is "reversed only for clear abuse of discretion by the trial judge." *Purnell*, 925 F.2d at 951 (citing *Meyer Goldberg, Inc. v. Fisher Foods, Inc.*, 823 F.2d 159, 161 (6th Cir. 1987)).

For mandatory intervention, "the court must permit anyone to intervene who . . . claims an interest relating to the property or transaction that is the subject of the action, and is so situated that disposing of the action may as practical matter impair or impede the movant's ability to protect its interest, unless existing parties adequately represent that interest." Fed. R. Civ. P. 24(a). The proposed intervenor must show that: "1) the application was timely filed; 2) the applicant possesses a substantial legal interest in the case; 3) the applicant's ability to protect its interest will be impaired without intervention; and 4) the existing parties will not adequately represent the applicant's interest." *Blount-Hill v. Zelman*, 636 F.3d 278, 283 (6th Cir. 2011) (citing *Grutter v. Bollinger*, 188 F.3d 394, 397-98 (6th Cir. 1999)). If any of these requirements is not met, the intervention will not be granted. *Id.* Motions to intervene are reviewed *de novo*, "except for the timeliness element, which is reviewed for an abuse of discretion." *Coalition to Defend Affirmative Action v. Granholm*, 501 F.3d 775, 779 (6th Cir. 2007) (quoting *Northland Family Planning Clinic, Inc. v. Cox*, 487 F.3d 323, 344 (6th Cir. 2007)).

### III. DISCUSSION

Defendant moves to dismiss Priorities due to lack of standing. The Legislature separately moves to intervene as defendants. The court will address each motion in turn.

**A.  Defendant's Motion to Dismiss**

Defendant argues that Priorities cannot be a party to the lawsuit. The thrust of
the claim is that Priorities alleges it suffers only a diversion of resources, in that it
willingly chooses to take on financial obligations to combat what it believes a negative
societal event, i.e., the rejection of absentee ballot applications and absentee ballots for
a lack of matching signatures. Taking upon themselves a campaign of spending without
a direct and immediate impact on pre-existing structures of the Priorities organization,
so Defendant's reasoning goes, amounts to a "generalized grievance," outside the
definition of an "injury in fact." *In re Capital Contracting Co.*, 924 F.3d 890, 897 (6th Cir.
2019) ("A particularized injury affects the party in a specific way (in contrast to a
generalized grievance), and a concrete injury affects the party in a real way (in contrast
to an abstract grievance).").

Defendant presents a strong case for dismissing Priorities; at the same time she
concedes the legitimacy of Accardo's standing. (ECF No. 17, PageID.188 ("[Accardo]
appears to have standing to raise the claims in the amended complaint.").) Defendant
also asks the court to engage in analysis of the extent of Article III standing within a set
of sharply contested interpretations related to claims that will, ultimately, continue to be
litigated as this case will not at this time be dismissed. The court does not see a
persuasive reason for doing so now: courts have generally refrained from expending
judicial resources on standing disputes that will not impact the ultimate disposition of the
claims presented. As the Sixth Circuit stated in *Phillips v. Snyder*, 836 F.3d 707, 714 n.2
(6th Cir. 2016), "when one party has standing to bring a claim, the identical claims
brought by other parties to the same lawsuit are justiciable." *See also Rumsfeld v.*

*Forum for Acad. and Inst. Rights, Inc.*, 547 U.S. 47, 52 n.2 (2006) (The Supreme Court agreeing with the Second Circuit that "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement"); *Parsons*, 801 F.3d at 710 (citations removed) ("A plaintiff must have standing for each claim pursued in federal court. However, only one plaintiff needs to have standing in order for the suit to move forward."); *Am. Civil Liberties Union of Ky. v. Grayson Co., Ky.*, 591 F.3d 837, 843 (6th Cir. 2010) ("The presence of one party with standing is sufficient."); *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d 644, 652 (6th Cir. 2007) ("[F]or purposes of the asserted declaratory judgment—though not necessarily for the requested injunction—it is only necessary that one plaintiff have standing."). Nonetheless, each form of relief sought must pass the court's justiciability requirements. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 185 (2000) (quoting *Lewis v. Casey*, 518 U.S. 343, 358 n.6 (1996) ("[A] plaintiff must demonstrate standing separately for each form of relief sought . . . . 'Standing is not dispensed in gross.'"). The court will not decide new issues outside of "identical claims" brought by a plaintiff with standing and will not add damages or remedies based on claims brought by a plaintiff lacking standing. *Phillips*, 836 F.3d at 714 n.2.

The reasoning behind this principle is preservation of judicial resources. It does not *prohibit* a court from ruling on a plaintiff's standing if another plaintiff asserts an identical claim. *Fednav Ltd. v. Chester*, 547 F.3d 607, 614 (6th Cir. 2008) ("Our determination of standing is both plaintiff- and provision-specific. That one plaintiff has standing to assert a particular claim does not mean that all of them do."); *Am. Civil Liberties Union v. Nat'l Sec. Agency*, 493 F.3d at 652 (citations removed) (emphasis in

original) ("The standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether the *particular plaintiff* is entitled to an adjudication of the *particular claims* asserted."). A district court in this Circuit explained this concept:

> As an initial matter, Plaintiffs posit that "[b]ecause Plaintiff Dummett has standing, all other Plaintiffs in the instant case, including Liberty Legal Foundation, also have standing." The Court finds that Plaintiffs' theory actually misstates the law. The Supreme Court has held that "the presence of one party with standing is sufficient to satisfy Article III's case-or-controversy requirement." [*Rumsfeld*, 547 U.S. at 52 n.2] Therefore, Plaintiffs must allege specific facts to show that at least one named Plaintiff has standing to bring these claims. One Plaintiff's standing, however, is not imputed to other named Plaintiffs [sic] who lack standing. Therefore, the Court will take up standing to participate in this suit as to each named Plaintiff and examine the pleadings to determine whether the elements of standing are stated with the requisite specificity.

*Liberty Legal Found. v. Nat'l Democratic Party of the USA, Inc.*, 875 F.Supp.2d 791, 799-800 (W.D. Tenn. 2012) (Anderson, J.). In essence, the presence of *someone* with standing to bring a claim does not imply standing for all plaintiffs asserting that claim, giving rise to a court's hesitancy to engage in analysis that will not impact the ultimate disposition of the claim.

The court, in the exercise its discretion, will permit Priorities to continue in this lawsuit. Although Defendant presents substantial arguments that Priorities has not suffered an "injury in fact," its resolution is by no means obvious, nor is the outcome certain. *Parsons*, 801 F.3d at 710. A complete analysis would expend valuable time and resources, but would have no effect on the significant and immediate issues presented in this litigation. (*See* ECF No. 22 (Plaintiffs moving the court to enjoin the State of Michigan's election process for the November 2020 elections).) The 2020 general election approaches; important aspects of Michigan's election laws are at issue.

If, going forward in this suit, Priorities seeks damages or remedies distinct from those sought by Accardo, or if Priorities' claims diverge in substance and analysis from Accardo to the extent that dismissing Priorities would actually affect the merits of the case, the court will then consider a decision on the question of Priorities' standing. Further, were Accardo to be dismissed from this lawsuit, the court would certainly address Priorities' standing. *Loren v. Blue Cross & Blue Shield of Mich.*, 505 F.3d 598, 607 (6th Cir. 2007) (quoting *Raines v. Byrd*, 521 U.S. 811, 818 (1997)) ("[N]o principle is more fundamental to the judiciary's proper role in our system of government that the constitutional limitation of federal-court jurisdiction to actual cases or controversies.").

It is of course possible that Defendant may later move to have Priorities dismissed, through summary judgment or otherwise. For the time being, however, Defendant's motion is denied.

## B. The Legislature's Motion to Intervene

Michigan's Legislature moves to intervene in this lawsuit, claiming Defendant may not represent adequately its interest in defending duly enacted laws. Priorities presents determined opposition to the motion; Defendant, silent, does not.

The court finds the Legislature's involvement in this suit warranted and will grant permissive intervention.

### i. Timeliness

The Legislature's motion to intervene must first be timely. Fed. R. Civ. P. 24(b)(1); *United States v. Michigan*, 424 F.3d at 445. Courts consider the following factors when deciding whether a motion to intervene is timely:

> (1) the point to which the suit has progressed; (2) the purpose for which intervention is sought; (3) the length of time preceding the

application during which the proposed intervenors knew or should have known of their interest in the case; (4) the prejudice to the original parties due to the proposed intervenors' failure to promptly intervene after they knew or reasonably should have known of their interest in the case; and (5) the existence of unusual circumstances militating against or in favor of intervention.

*Stupak-Thrall*, 226 F.3d at 472-73 (quoting *Jansen v. City of Cincinnati*, 904 F.2d 336, 340 (6th Cir. 1990)). "No one factor is dispositive, but rather the determination of whether a motion to intervene is timely should be evaluated in the context of all relevant circumstances." *Zelman*, 636 F.3d at 284.

 Priorities filed this lawsuit on October 30, 2019 and the Legislature moved to intervene on November 27, 2019, a mere twenty business days later (nineteen, accounting for the effect of Veterans' Day). It is difficult to imagine a more timely intervention. All the more so in view of the Legislature not having been served or otherwise formally noticed. Indeed, the Legislature moved to intervene even before *Defendant* responded to the complaint by filing a motion to dismiss on December 12, 2019. (ECF No. 12.) The Legislature is clearly motivated and was diligent and effective in proposing intervention at the earliest possible stage of the litigation.

First, the Legislature moved to intervene before the case progressed at all, before preliminary dispositive motions and well before discovery began. *Glickman*, 226 F.3d at 473.

Second, the Legislature seeks to intervene on the concern that Defendant may not fully and aggressively defend the election laws at issue, specifically in terms of possible settlement. The court need not opine as to the merits of this argument, but the Legislature has certainly moved to intervene in time to achieve

its purposes. *Id.* With Plaintiffs having moved for a permanent injunction against the State on February 25, 2020, the Legislature will have an opportunity to address the merits thereof, and, if it so desires, to provide input on the terms of any settlement the parties may seek to bring about.

Third, the length of time prior to filing was minimal. Considering delays in information and the time needed to draft a motion. There exists no earlier time the Legislature "should have known of their interests in [this] case." *Id.*

Fourth, the court finds that the Legislature "promptly intervened." *Id.* Thus, any consideration of prejudice resulting from the Legislature's "failure to promptly intervene" is unnecessary. *Id.* If such an analysis were to be undertaken, the court would find no prejudice.

Fifth and lastly, there are no "unusual circumstances militating against" intervention. *Id.* In fact, given the unique impact this suit could have on upcoming elections, the court anticipates the Legislature's involvement as being important and helpful, perhaps even indispensable.[1]

Considering "all relevant circumstances," the Legislature was timely. *Zelman*, 636 F.3d at 284. Plaintiffs and Defendant do not contest this finding.

### ii. Common Question of Fact or Law

The Legislature shares a "common question of law or fact" with the original action. Fed. R. Civ. P. 24(b)(1). It seeks to protect its interest in the State's election laws. The laws challenged by Plaintiffs were enacted by the

---

[1]     For a more thorough discussion of the Legislature's interest and the importance of its involvement in this suit, see *infra* Sections III.B.ii, III.B.iii, and III.B.iv.

Legislature. Mich. Const. art. IV, § 26 ("No bill shall become a law without the concurrence of a majority of the members elected to and serving in each house."). The Michigan Constitution also expressly gives power to the Legislature to "enact laws . . . to preserve the purity of elections," an area of authority into which anti-fraud measures, such as the signature matching laws at issue, would fall. Mich. Const. art. II, § 4(2). Signature matching laws also are significant in absentee voting procedures, and the Michigan Constitution specifically grants the Legislature the responsibility "to provide for a system of voter registration and absentee voting." *Id.*

The Michigan Legislature is a separate and coequal branch of government. Mich. Const. art. III, § 2 ("The powers of government are divided into three branches: legislative, executive and judicial."); *Judicial Attorneys Ass'n v. State*, 459 Mich. 291, 305 (1998) (quoting *United States v. Will*, 449 U.S. 200, 228 (1980)) ("[A]n indispensable ingredient of the concept of coequal branches of government is that each branch must recognize and respect the limits on its own authority and the boundaries of authority delegated to the other branches."). Although the Executive Branch, represented by Defendant, is tasked with enforcing the law and providing the primary defense against lawsuits directed at the State, the Legislature has an interest in the preservation and constitutionality of the laws governing the State. Mich. Comp. Laws § 14.29 ("It shall be the duty of the attorney general . . . to prosecute and defend all suits relating to matters connected with [the executive branch]."); *Karcher v. May*, 484 U.S. 72 (1987) (accepting a state legislature's intervention to defend a state law challenged on

constitutional grounds); *I.N.S. v. Chadha*, 462 U.S. 919, 940 (1983) (recognizing in the federal context that the legislature has an interest in "defend[ing] the validity of a statute," and if the executive refuses to defend a law, the legislature is, in fact, the "proper party"); *Taxpayers of Mich. Against Casinos v. State*, 471 Mich. 306, 356 (2004) (Weaver, J., concurring) (citing 16A Am. Jur. 2d Constitutional Law §§ 258, 275 (2004)) ("The executive power is, first and foremost, the power to enforce the laws or to put the laws enacted by the Legislature into effect.").

The collection of elected officials constituting the Legislature will be affected in a way unlike the average population. Michigan's voting procedures determine how elected representatives are selected. *League of Women Voters of Mich. v. Johnson*, 902 F.3d 572, 579 (6th Cir. 2018) (reversing a denial of intervention for Michigan congressmen in a case challenging the map of electoral districts, reasoning that the issues in the case "affect the [c]ongressmen directly and substantially by determining which constituents [they] must court for votes and represent in the legislature" and that the "[c]ongressmen serve constituents and support legislation that will benefit the district and individuals and groups therein"); *League of Women Voters of Mich. v. Benson*, No. 17-cv-14148, 2019 WL 8106247, at *1 (E.D. Mich. Feb. 1, 2019) (Clay, Hood, Quist, J.J.) (granting mandatory intervention for the Michigan Senate based on the Senate's alleged interest in the boundaries of voting districts that select members). If Plaintiff is successful, it could allow substantially more submitted ballots to be counted, potentially changing the results of elections and the makeup of the legislature.

The Legislature's alleged interest is directly related to Plaintiffs' claims against Michigan's signature matching laws. If Plaintiff prevails in obtaining an injunction against the enforcement of the signature matching laws or in a judgment that the laws are unconstitutional, the laws that the Legislature enacted, that the Legislature is tasked with designing, and that impact the manner in which members the Legislature are chosen will be essentially declared void, whether temporarily or permanently. This is not a situation where the interest of the Legislature is only peripherally relevant and where the main contests in the case have no effect on that interest. *See Kirsch v. Dean*, 733 Fed. App'x 268, 279 (6th Cir. 2018) (affirming denial of permissive intervention, mentioning that the proposed intervenor sought to litigate "an issue that is entirely tangential to the [relevant questions in the original lawsuit]" and thus did not have "a common question of law or fact"); *Bay Mills Indian Comm. V. Snyder*, 720 Fed. App'x 754 (6th Cir. 2018) (finding "a common question of law or fact" lacking when the proposed intervenor was not a party to the agreement central to the dispute and whose only interest was the interpretation of a generally applicable statute, like an "employer . . . interven[ing] in any Title VII suit"). Priorities, as the only party objecting to intervention, does not contest this finding.

### iii. Undue Delay or Prejudice

The Legislature's intervention will not cause "undue delay or prejudice" to the original parties. Fed. R. Civ. P. 24(b)(3); *United States v. Michigan*, 424 F.3d at 445. The Legislature is not attempting to inject wholly unseen, unnecessary, or irrelevant issues into this litigation. *Kirsch*, 733 Fed. App'x at 279 (reasoning that

denial of permissive intervention may be appropriate where the proposed intervention would require litigation of new ethical questions); *United States v. Michigan*, 424 F.3d at 445 (affirming denial of permissive intervention when the proposed intervenor sought to litigate new and complex issues that would require "prolonged discovery"). *But see Johnson*, 902 F.3d 578-79 (reversing denial of permissive intervention when factors weighed strongly in favor of intervention, despite the proposed intervenor attempting to raise new defenses). If allowed to intervene, the Legislature would address the same issues Defendant must confront, namely whether Michigan's signature matching laws violate the First and Fourteenth Amendments. (ECF No. 1, PageID.22-26 (Plaintiffs' constitutional claims).)

Further, the Legislature moved to intervene at the earliest possible stage of litigation. The court and the parties would not be forced to reopen discovery and relitigate previously decided motions. *Bradley v. Miliken*, 828 F.2d 1186, 1194 (6th Cir. 1987) (affirming denial of permissive intervention, mentioning "the advanced age of the case," "the possible adverse effect of further delays," and the fact that successful intervention may result in "the court reconsider[ing] its prior rulings" in finding that the "concern over delay and prejudice to the parties is particularly apparent"). The Legislature is in a strong position to participate in all stages of this litigation, virtually from inception.

While it uses strong language in its motion for intervention, the Legislature attempts no more than to become a defendant and litigate the claims Plaintiffs have currently presented. It may be true that adding another party would add

16

time and energy, for example requiring additional deposition questions or additional briefing on some motions. It may also be true that the Legislature could add different, and potentially successful, defenses to the signature matching laws during the course of litigation. However, expending such additional energy is not a waste, and appears to the court's satisfaction as important to effectuate the Legislature's purpose, providing a vigorous defense to Michigan's election laws. If there are costs or inefficiencies in the process, the court finds them worthwhile.

Considering that Defendant's motion to dismiss fails on procedural grounds, and even if successful would have still required the court to conduct a merits analysis at some point, the case will progress to the next and significant phase of this litigation: deciding the fate of anti-fraud procedures in the state election system. The court finds that Plaintiffs will not be unfairly prejudiced in having a motivated opponent that is willing to contest this case's important legal questions. Defendant, again, offers no dispute about the Legislature's entry into the case.

### iv. Other Factors the Court Finds Relevant

"Other relevant factors" weigh in favor of the Legislature's intervention. *United States v. Michigan*, 424 F.3d at 445. The Legislature argues Defendant will not fully and adequately defend Michigan's signature matching laws and may even abandon her role as an adversarial party, as she has done in other lawsuits. *League of Women Voters of Mich. v. Benson*, No. 2019 WL 8106247, at *1 ("Benson recently replaced her predecessor as Defendant, and unlike former Secretary of State Ruth Johnson, refuses to defend the existing legislative

maps."). The court makes no determination as to any such issues, and in fact, rejects any suggestion that how Defendant will treat this case going forward can be predicted based upon the mere political party identity of the present Secretary of State and the incumbent Michigan Attorney General, even considering previous public statements they have made about Michigan's election laws.

Recall that Defendant moved to dismiss before Accardo was added, and when Priorities was the only Plaintiff. (ECF No. 12.) If Defendant had been successful at that initial point, this case would have come to an end and there would have been no need for the Legislature to intervene.[2]

Nonetheless, having denied Defendant's motion to dismiss, it is important for the court to hear the Legislature's voice. The Legislature is an interested party willing to perform research and provide analysis that (the court hopes) will be well-reasoned and of assistance to the court's work. Whether its arguments are or are not successful is not determinative. At issue is the fate of an important aspect of Michigan's electoral system, one that, depending on circumstances, from which direction one looks, and the law as determined by this court's eventual ruling, may be determined as violative of citizens' rights . . . or as

---

[2] The court must note that Defendant has failed to timely respond to Plaintiffs' February 25, 2020 motion for preliminary injunction. (ECF No. 22.) Defendant had until March 17 to respond and no response has been filed. E.D. Mich. L.R. 7.1(e)(1). Defendant has not contacted the court regarding an extension. The court does not doubt that this may well be an artifact of government and private law offices transforming into work-at-home environments in the wake of the current national and state level emergencies. But, if it were to be revealed that Defendant (or the Attorney General) is simply unwilling to defend this suit, it would become even more important for the Legislature to intervene. *Chadha*, 462 U.S. at 940.

preserving, consistent with constitutional standards, the integrity of Michigan's elections.

Plaintiffs have demonstrated that they intend to press forward the disposition of this case, filing a motion for preliminary injunction on February 25, 2020. (ECF No. 22.) If the motion is granted in full, the court would immediately suspend Michigan's signature matching system for any approaching election. (*Id.*, PageID.249 ("Michigan's Signature Matching Regime threatens to disenfranchise many more voters in the upcoming 2020 general election—the first general election in which Michigan will allow no-reason absentee voting.").) Given the significance of the questions presented and the potential effect on the legitimacy of a national election, it is imperative that the Legislature be allowed to present its opinion. The court sees no reason to limit the Legislature's involvement to an *amicus curiae* role, and will allow the legislature to participate fully as a party. *Michigan State AFL-CIO v. Miller*, 103 F.3d at 1248 ("In light of the district court's decision permitting [the proposed intervenor] to participate in briefing and oral arguments as an amicus curiae, it is difficult to see how granting intervention would have materially increased either delay or prejudice.").

With permissive intervention granted, the court will not address the alternative method of mandatory intervention, which requires a higher standard of proof, and the court's approval or denial of which would not impact the Legislature's involvement in this suit. *Grubbs*, 870 F.2d at 345.

## IV. CONCLUSION

Defendant's motion to dismiss would not affect the merits of the case. If granted, only one Plaintiff, Priorities, would be dismissed. The court will decline to review this complex and unripened question. Further, the Legislature has met the basic requirements of permissive intervention and the court will exercise discretion in allowing the Legislature to participate in this suit.

Plaintiffs have filed a motion for preliminary injunction. (ECF No. 22.) Responses to motions for injunctive relief must be filed within twenty-one days after service of the motion. E.D. Mich. L.R. 7.1(e)(1).

Given that the Legislature has only now been permitted to intervene as a defendant, the Legislature would ordinarily be granted twenty-one days from the issuing of this order to respond to Plaintiffs' motion. However, the present State of Emergency, declared nationally and in Michigan, has utterly upended the court's ordinary procedures and those of litigants and the attorneys representing them. Accordingly,

IT IS ORDERED that Defendant's "Motion to Dismiss Amended Complaint" (ECF No. 17) is DENIED.

IT IS FURTHER ORDERED that the Michigan Legislature's "Motion to Intervene" (ECF No. 7) is GRANTED.

Lastly, IT IS ORDERD that the parties are DIRECTED to meet and confer within two weeks of this order, or by **April 7, 2020**, to attempt to reach an agreement on a briefing schedule. The parties are FURTHER DIRECTED to report the results of the meeting in a joint memorandum by **April 17, 2020**.

s/Robert H. Cleland                    /
ROBERT H. CLELAND
UNITED STATES DISTRICT JUDGE

Dated:  March 24, 2020

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, March 24, 2020, by electronic and/or ordinary mail.

s/Lisa Wagner                          /
Case Manager and Deputy Clerk
(810) 292-6522

S:\Cleland\Cleland\JUDGE'S DESK\C2 ORDERS\19-
13188.PRIORITIES.MotiontoDismissandMotiontoIntervene.RMK.CHD.RHC.4.docx